# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

International Building Supply, LLC f/k/a
International Supply, LLC, et al.,

                Plaintiffs,

v.

Hudson Meridian Construction Group, LLC,

                Defendant.

Civil No. 3:22-cv-01167 (TOF)

June 21, 2025

## <ins>RULING AND ORDER ON<br>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</ins>

## I.    INTRODUCTION

This case is a construction industry dispute between two plaintiffs, International Building Supply, LLC, f/k/a International Supply LLC ("Supply") and International Framers, LLC ("Framers" and, together with Supply, "Plaintiffs"), and one defendant, Hudson Meridian Construction Group, LLC ("Hudson"). The Plaintiffs allege that Hudson engaged them to supply and install the wood framing in a housing development in New Haven. (Am. Compl., ECF No. 70, Count One ¶ 40, Count Three ¶ 40.) Hudson prepared two Letters of Intent ("LOIs"), which the Plaintiffs characterize as binding contracts but Hudson regards as non-binding. (*Compare* Pls.' Opp'n to Mot. for Summ. J., ECF No. 95, at 10-11 ("Opp'n") *with* Def.'s Memo. of L. in Supp. of Mot. for Summ. J., ECF No. 82-17, at 7-10 ("Memo.").) Hudson later "rescind[ed] and terminat[ed]" the LOIs (Ex. 13 to Memo., ECF No. 82-14), and this lawsuit ensued.

The Plaintiffs' suit is in five counts. (*See generally* Am. Compl., ECF No. 70.) In Count One, Supply alleges that the first of the two LOIs – the one for supplying the wood framing

components – was an enforceable contract that Hudson breached with its rescission letter.  (*Id*. at 7.)  In Count Two, Supply alleges that Hudson is also liable in promissory estoppel.  (*Id*.)  In Count Three, Framers asserts that the second LOI – the one for installing the framing – was likewise an enforceable contract that Hudson breached with its repudiation.  (*Id*. at 8.)  And in Counts Four and Five, both Plaintiffs allege that Hudson breached the implied covenant of good faith and fair dealing and violated the Connecticut Unfair Trade Practices Act ("CUTPA") by its conduct.  (*Id*. at 8-9.)

Hudson has now moved for summary judgment on all counts.  (Def.'s Mot. for Summ. J., ECF No. 82 ("Motion").)  First, it says that the two contract breach claims must fail because "[t]here is no question of law or fact" that the LOIs were not contracts.  (Memo. at 9.)  Next, it says that the promissory estoppel claim must fail because it is premised on a factual assertion that is "literally impossible" to be true.  (*Id*. at 3, 11.)  Finally, it argues that the implied covenant and CUTPA claims must fail because they require not only an enforceable contract, but also a breach of that contract arising out of "some interested or sinister motive" or "unfair" or "deceptive" practice, all of which it denies.  (*Id*. at 12-14.)  The Plaintiffs oppose Hudson's motion, arguing that all five claims are subject to genuine factual dispute if not entirely erroneous, making summary judgment inappropriate.  (*See generally* Opp'n.)

For the reasons set forth below, the Court agrees with the Plaintiffs that genuine disputes of material fact preclude summary judgment on the contract breach and promissory estoppel counts.  But it agrees with Hudson that no such disputes have been presented on the implied covenant and CUTPA counts.  Hudson's motion will therefore be granted in part and denied in part.  Counts Four and Five will be dismissed, but the case will proceed to trial on Counts One through Three.

## II. FACTUAL BACKGROUND

Supply and Framers are two construction companies located in Naugatuck, Connecticut. (Am. Compl., ECF No. 70, at 1.)  Anthony Gallagher is the sole member and manager of both companies (Decl. of A. Gallagher, ECF No. 95-3, ¶ 1), and Daniel Soares serves as their Vice President of Finance and Operations.  (Decl. of D. Soares, ECF No. 95-2, ¶ 1.)  Kris Backman works for Supply as an estimator.  (Decl. of K. Backman, ECF No. 95-4, ¶ 1.)

Hudson is a construction company with an office in White Plains, New York.  (Am. Compl., ECF No. 70, at 1.)  Daniel Hooker is the company's Senior Project Manager and Vice President.  (Decl. of D. Hooker, ECF No. 82-16, ¶ 2.)  Steven Calicchio is its Vice President and Project Executive .  (Dep. Tr. of S. Calicchio, ECF No. 82-3, at 1.)

This case involves a dispute over a construction project at 201 Munson Street in New Haven, Connecticut (the "Project").  (L.R. 56(a)2(i) Stmt., ¶ 2.)  Hudson was the general contractor.  (*Id.* ¶ 3.)  In early 2022, "[t]he parties engaged in negotiations for [Supply] to provide the framing materials for the Project, and for [Framers] to provide labor for the framing work." (*Id.* ¶ 4.)  Supply says that it initially proposed "turnkey" prices of between $9,000,000 and $10,000,000, but Hudson rejected those bids as too high, and "advised that the supply bid had to come in at under $7,000,000." (Decl. of D. Soares, ECF No. 95-2, ¶¶ 11-13.)  According to Supply, it responded by making two non-turnkey bids dated January 31, 2022 and February 2, 2022, in which it proposed to provide the lumber, floor trusses, and hardware for the Project for a total of $6,921,774.  (*Id.* ¶¶ 16, 17; *see also* Exs. 1 & 3 to Opp'n, ECF Nos. 95-5, 95-7.)

The parties met at Hudson's White Plains office on the morning of February 8, 2022. (Decl. of D. Soares, ECF No. 95-2, ¶ 18.)  Messrs. Gallagher, Soares, and Backman attended for the Plaintiffs, and Messrs. Hooker and Calicchio attended for Hudson.  (*Id.*)  The parties disagree

on what happened at the meeting, and on much of what happened afterward. Mr. Soares says that Hudson and Supply "agreed . . . that the amount of the supply contract price would be $6,911,000, with a $150,000 credit for hardware and a $100,000 allowance for value engineering[.]" (*Id.* ¶ 22.) He adds that Hudson and Framers "agreed . . . that the framing contract price would be $3,230,000." (*Id.*) According to Mr. Soares, "Mr. Hooker advised us that both International Supply and Framers had been awarded the contracts for supply and labor and he promised us that LOIs would be issued to us that day," and he further "told us to lock in our lumber pricing with our lumber supplier so that we would not be subject to the risk of the lumber prices rising the next day[.]" (*Id.* ¶¶ 23, 24.) As will be shown below, Hudson disagrees that any binding commitments were made at the meeting.

After the meeting, two significant events happened within minutes of each other. First, Mr. Soares returned to his Naugatuck office and emailed a letter of intent to Supply's own lumber supplier, Sherwood Lumber. (*Id.* ¶ 27; *see also* Ex. 4 to Opp'n, ECF No. 95-8.) Second, Mr. Hooker emailed two LOIs to the Plaintiffs – one to Supply for "the Furnish of Framing Material/Trusses/Hardware/Building Wrap" for the Project (the "Supply LOI"), and one to Framers for "Labor for Framing/Material/Trusses/Hardware/Building Wrap" (the "Framers LOI"). (Exs. 5 and 6 to Opp'n, ECF Nos. 95-10, 95-11.) The parties once disputed the order in which these events occurred, but they apparently now agree that Mr. Soares' LOI to Sherwood Lumber preceded Mr. Hooker's LOIs to the Plaintiffs by fourteen minutes. (L.R. 56(a)2(i) Stmt. ¶ 7 (Plaintiffs' admission "that Hudson Meridian emailed two LOIs at 5:08 p.m., which is 14 minutes after International Supply emailed its LOI to Sherwood Lumber").) The sequence of events will be particularly relevant to the promissory estoppel claim, as will be discussed below.

4

Both LOIs were labeled "Letter of Intent" in bold, capital letters at the top of the document. (Exs. 5 and 6 to Opp'n, ECF Nos. 95-10, 95-11.)  The Supply LOI "confirm[ed Hudson's] intent to enter into a Contract with [Supply] for . . . the Contract Price of . . . $6,911,000.00."  (Ex. 5 to Opp'n, ECF No. 95-10.)  The Framers LOI likewise "confirm[ed Hudson's] intent to enter into a Contract with [Framers] for . . . the Contract Price of . . . $3,230,000.00."  (Ex. 6 to Opp'n, ECF No. 95-11.)  Both LOIs stated that "[t]he Final Trade Contract will be forwarded to your attention shortly," and they further stated that they could "be rescinded by Hudson Meridian at any time, subject to the terms of the Trade Contract."  (Exs. 5 and 6 to Opp'n, ECF Nos. 95-10, 95-11.)  As will be discussed extensively in Section III.D *infra*, a principal dispute between the parties is whether these LOIs constituted enforceable contracts, or whether instead they were merely unenforceable expressions of an incomplete set of preliminary understandings.

The parties' representatives spoke and corresponded with each other on several occasions over the ensuing months.  Supply says that, once it noticed that its LOI did not expressly say that it was not a turnkey deal, it "asked Hudson Meridian to issue a purchase order to us because we had committed to purchase materials from our lumber Supplier, Sherwood."  (Decl. of D. Soares, ECF No. 95-2, ¶ 33.)  Hudson says that it sent "draft material and labor contracts to Plaintiffs," but that the Plaintiffs "rejected the terms of the material contract and requested that it be formatted to their liking, in the form of a purchase order."  (Decl. of D. Hooker, ECF No. 82-16, ¶¶ 15, 16.)  Hudson adds that it "repeatedly requested that the Plaintiffs provide it with prequalification information, including but not limited to: workers compensation certificates, financial statements, letters of recommendation and certificates of insurance."  (*Id.* ¶ 19.)  Hudson alleges that "[t]he Plaintiffs never provided any of this information," and moreover it says that the little prequalification information it received revealed that "Plaintiffs' workers' compensation insurance

rating (known as an experience modification rating or 'EMR rating') was high, which meant that the cost of insurance for the project would be significantly higher for Hudson Meridian." (*Id.* ¶¶ 19, 20.)

On June 15, 2022, Hudson notified the Plaintiffs that it was "rescinding and terminating" the LOIs. (Ex. 13 to Memo., ECF No. 82-14.) Hudson noted that, "[a]s per the terms of the Letter of Intent, it may be rescinded and terminated at any time." (*Id.*) It then stated that, "[a]lthough we have no legal obligation to supply a reason for this action, we note that you have failed to timely complete the pre-qualification forms that were supplied to you, and which are a condition precedent for your being retained as a subcontractor or vendor at the Project." (*Id.*) In the copy of the letter sent to Supply, Hudson also "note[d] that we have been unable to agree upon various important terms of our written Agreement, we have significant differences re the current price of materials you will be providing to Hudson Meridian, etc." (*Id.* at 1.) In the copy sent to Framers, it included the same sentence, except that "price of materials" was replaced with "price of work." (*Id.* at 2.) On July 6, 2022, Supply "commence[d] to purchase and take delivery of materials from Sherwood Lumber," notwithstanding Hudson's rescission/termination letter. (Decl. of D. Soares, ECF No. 95-2, ¶ 47.)

On September 15, 2022, the Plaintiffs filed their initial complaint in this Court. (Compl., ECF No. 1.) As noted above, the complaint was in five counts. In Count One, it alleged that the Supply LOI was a binding contract that Hudson breached with its rescission/termination letter. (*Id.* at 6.) In Count Two, Supply alleged that Hudson was liable in promissory estoppel, because Supply had contracted with Sherwood "[i]n reliance on the defendant's promise made in its February 8 emails." (*Id.* at 6 and ¶ 28.) In Count Three, Framers asserted that the Framers LOI was a binding contract that Hudson breached with its purported rescission/termination. (*Id.* at 6.)

Finally, both Plaintiffs alleged in Counts Four and Five that Hudson breached the implied covenant of good faith and fair dealing and violated CUTPA with its allegedly "improper," "dishonest," "unfair," and "deceptive" conduct.  (*Id.* at 7.)

The Clerk of the Court assigned the case to the Honorable Omar A. Williams.  Hudson moved to dismiss all five counts of the complaint (Mot. to Dismiss, ECF No. 16), but Judge Williams denied the motion in its entirety in an order dated February 21, 2024.  *Int'l Supply, LLC v. Hudson Meridian Constr. Grp., LLC*, No. 3:22-CV-1167 (OAW), 2024 WL 707014, at *2 (D. Conn. Feb. 21, 2024) ("*Int'l Supply I*").  The parties later consented to Magistrate Judge jurisdiction (ECF No. 43), and Judge Williams transferred the case to the undersigned.  (ECF No. 44.)  The Plaintiffs amended their complaint (Am. Compl., ECF No. 70), and Hudson answered.  (ECF No. 94.)  The parties completed discovery.  (*See* ECF No. 69.)

On January 31, 2025, Hudson moved for summary judgment.  (Motion.)  After moving for and obtaining an extension of time, the Plaintiffs filed their opposition on March 24, 2025.  (Opp'n.)  Hudson filed a reply brief on April 7, 2024 (Reply Memo. of L. in Supp. of Mot. for Summ. J., ECF No. 96) ("Reply"), and the Court heard oral argument on April 17, 2025.  (Minute Entry, ECF No. 97.)  The Motion is therefore ripe for decision.

## III.   DISCUSSION

### A.   Subject Matter Jurisdiction

The Court begins by addressing its own jurisdiction.  "Federal courts are courts of 'limited jurisdiction,' meaning that they cannot hear just any case."  *Miro v. City of Bridgeport*, No. 3:20-cv-346 (VAB) (TOF), 2020 WL 12893928, at *1 n.2 (D. Conn. Mar. 25, 2020), *report and recommendation adopted*, slip op. (D. Conn. Apr. 15, 2020) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)).  "Leaving aside some others that are not relevant here, a

federal court can typically adjudicate only three types of claims: (1) those that 'arise under the Constitution, laws, or treaties of the United States' – so-called 'federal question' jurisdiction under 28 U.S.C. § 1331; (2) disputes between citizens of different states, where the amount in controversy exceeds $75,000 – 'diversity jurisdiction' under 28 U.S.C. § 1332; and, under certain circumstances, (3) other claims that are 'so related' to an 'original jurisdiction' claim that they 'form part of the same case or controversy under Article III of the United States Constitution' – 'supplemental jurisdiction' under 28 U.S.C. § 1367(a)." *Id.* (brackets omitted). In this case, the Plaintiffs seek to invoke the Court's diversity jurisdiction. (Am. Compl., ECF No. 70, ¶¶ 4-6.)

Under 28 U.S.C. § 1332, diversity jurisdiction does not exist unless two principal requirements have been met. The first is that the "matter in controversy" must exceed "the sum or value of $75,000, exclusive of interest and costs[.]" 28 U.S.C. § 1332(a). In the context of this case, the second is that the dispute must be "between . . . citizens of different States[.]" *Id.* The party seeking to invoke diversity jurisdiction bears the burden to show that both requirements have been satisfied. *See Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 160 (2d Cir. 1998) ("The party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete."); *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) ("A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." (citation and quotation marks omitted)).

In this case, the amount-in-controversy requirement has been met. While the jurisdictional amount "is ordinarily established by the face of the complaint and the dollar-amount actually claimed," when the plaintiff does not include that information in its complaint, courts can look to "the nature of the claims, factual allegations within the pleadings, and the record outside the

pleadings to determine the amount in controversy." *Price v. PetSmart, Inc.*, 148 F. Supp. 3d 198, 200-01 (D. Conn. 2015) (quoting *Burr ex rel. Burr v. Toyota Motor Credit Co*., 478 F. Supp. 2d 432, 438 (S.D.N.Y. 2006)).  Here, the Plaintiffs did not include a dollar amount in either their initial or amended complaint (*see* ECF Nos. 1, 70), but the summary judgment briefs and exhibits plainly establish that more than $75,000 is at stake.  The combined dollar amounts of the two LOIs exceed $10,000,000 (Exs. 5 and 6 to Opp'n, ECF Nos. 95-10, 95-11), and Hudson acknowledges that the Plaintiffs are claiming "over $2.8 million in damages" from their alleged breach.  (Memo. at 1.)

The diversity-of-citizenship requirement has also been met.  All three parties are limited liability companies (Am. Compl., ECF No. 70, at 1), and a limited liability company "takes the citizenship of each of its members." *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012).  When one of the members is itself an LLC, the first LLC's citizenship is determined by the citizenship of the members of the second.  *Avant Cap. Partners, LLC v. W108 Devel. LLC*, 387 F. Supp. 3d 320, 322 (S.D.N.Y. 2016) ("[I]f either of the LLC-parties have members which are LLC's, the citizenship of the members of those LLC's must also be given, and must be diverse[.]").  Once the natural persons who make up the direct or indirect membership of the LLC have been identified, their citizenship is determined by their domicile. *Universal Reins. Co., Ltd. v. St. Paul Fire & Marine Ins. Co.*, 224 F.3d 139, 141 (2d Cir. 2000) ("A person is deemed a citizen of the state wherein he or she is domiciled[.]").  In this case, the Plaintiffs have confirmed that Mr. Gallagher was the sole member of both Supply and Framers at the time they filed this suit, and that he is a Connecticut citizen.  (Parties' Jt. Stmt. Re: Citizenship, ECF No. 46); *see also Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998) (holding that the relevant date for determining the existence of diversity is the date "the action is

commenced"). Hudson has confirmed that its sole member was Cote Construction Group, LLC, whose sole member was William I. Cote, Jr., a New Jersey citizen. (Parties' Jt. Stmt. Re: Citizenship, ECF No. 46.) Because the Plaintiffs are citizens of Connecticut and Hudson is a citizen of New Jersey, and because the amount in controversy exceeds $75,000, federal subject matter jurisdiction exists under 28 U.S.C. § 1332.

### B.      The Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial burden of demonstrating the absence of any genuine factual issues." *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If it meets that burden, "the non-moving party is obligated to produce probative evidence supporting its view that a genuine factual dispute exists." *Id.* To do so successfully, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts[;]" it must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original) (quoting then-Fed. R. Civ. P. 56(e)).

In deciding a motion for summary judgment, the court must not decide *bona fide* factual disputes. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court's "duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd.*

*P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). And in performing its issue-finding function, the court must "assess the record in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (alterations omitted) (quoting *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990)).

Genuine disputes of material fact warrant denial of a motion for summary judgment. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assur. Co. v. Hapag Lloyd Container Line, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks and brackets omitted) (quoting *Marvel Characters Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)).

### C.     Choice of Law

In deciding what body of law to apply to disputes under its diversity jurisdiction, this Court follows Connecticut choice-of-law rules. "[A]s a general matter, a federal district court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits." *Pappas v. Philip Morris, Inc.*, 915 F.3d 889, 893 (2d Cir. 2019) (emphasis omitted). "This rule applies as well to the laws and rules governing the choice of law to apply when that choice is uncertain." *U.S. Fid. & Guar. Co. v. S.B. Phillips Co*., 359 F. Supp. 2d 189, 204-05 (D. Conn. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg Co*., 313 U.S. 487 (1941)).

In contract cases such as this one, Connecticut follows the "most significant relationship" approach from the Restatement (Second) of Conflict of Laws. *Reichhold Chems., Inc. v. Hartford Acc. & Indem. Co.*, 252 Conn. 774, 781 (2000). Under the Restatement, absent a contractual choice

of law provision, courts look to several factors to determine the most significant relationship: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."  Restatement (Second) of Conflict of Laws § 188 (1971).  In this case, some of these factors might arguably suggest the application of New York law.  Many of the negotiations took place in White Plains (*see* Decl. of D. Soares, ECF No. 95-2 ¶ 18; Decl. of A. Gallagher, ECF No. 95-3 ¶ 18; Decl. of K. Backman, ECF No. 95-4 ¶ 15, D. Soares Dep. Tr., ECF No. 95-25, 12:02-16), and the LOIs appear to have been signed by Mr. Hooker in Manhattan.  (Exs. 5 and 6 to Opp'n, ECF Nos. 95-10, 95-11.)

The Court will nonetheless apply Connecticut law, for two reasons.  First, other Restatement factors support the application of Connecticut law; the place of performance and the subject matter of the alleged contracts, for example, are both in New Haven.  (*Id.*)  Second and even more importantly, the parties evidently agree that Connecticut law applies.  While neither side addressed choice of law in its summary judgment briefs,[1] both cited Connecticut cases almost exclusively (*see generally* Memo., Opp'n, Reply), and neither side objected when Judge Williams applied Connecticut law at the motion to dismiss stage.  *Int'l Supply I*, 2024 WL 707014, at *2. Choice of law arguments can be waived and "a party may relinquish its right to have the laws of a particular state applied if it fails to raise the choice of law issue in a timely manner."  *Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Pub. Corp.*, 2 F. Supp. 3d 192, 197 (D. Conn. 2014), *aff'd sub nom. Call Ctr. Techs., Inc. v. Interline Travel & Tour, Inc.*, 622 F. App'x 73 (2d

---

[1]	In Hudson's briefing in support of its Motion to Dismiss, it stated that that "the substantive law of the state of Connecticut applies to the dispute at hand" because "the subject of the underlying contract negotiations involved a project in Connecticut[.]"  (Memo. of L. in Supp. of Mot. to Dismiss, ECF No. 16-1, at 3 n.4.)

Cir. 2015) (summary order); *see also Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) ("Implied consent is sufficient to establish choice of law." (quoting *Krumme v. WestPoint Stevens, Inc*., 238 F.3d 133, 138 (2d Cir.2000))).   Because the parties have argued for the application of no other state's law, and because Connecticut is both the place of performance and the location of the subject matter of the alleged contracts, the Court will apply Connecticut law to this dispute.

### D.    Counts One and Three:  Contract Breach

Under Connecticut law, a breach of contract claim has four basic elements: "formation of an agreement, performance by one party, breach of the agreement by the other party, and damages."  *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014).  As noted above, the Plaintiffs allege in Counts One and Three that the LOIs constituted enforceable contracts, and that Hudson breached them with its rescission/termination letters.  (Am. Compl., ECF No. 70, at 7-8.)   In its Motion and supporting Memorandum, Hudson challenges these counts on both legal and factual grounds.  (Memo. at 1.)  The Court will address both types of challenge in turn.

### 1.    *Hudson's legal challenges*

Hudson argues that "Plaintiffs' claims for breach of contract . . . fail because the letters of intent, as a matter of law, are not binding contracts."  (*Id.*)  It cites *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 77 n.33 (2005) in support of its argument.  (*Id.* at 7-8).  In *Glazer* the Connecticut Supreme Court did indeed observe that, "[g]enerally," the term "letter of intent" "refers to a writing documenting the preliminary understanding of parties who intend in the future to enter into a contract."  274 Conn. at 77 n.33 ((quoting *Rennick v. O.P.T.I.O.N. Care, Inc*., 77 F.3d 309, 315 (9th Cir.), *cert. denied*, 519 U.S. 865 (1996)).  The court added that the "purpose and function of

a preliminary letter of intent is not to bind the parties to their ultimate contractual objective," but rather "only to provide the initial framework from which the parties might later negotiate a final agreement, if the deal works out." *Id.* (ellipsis omitted) (quoting *Rennick*, 77 F.3d at 315). Citing these passages, Hudson asks the Court to hold that "[t]here is no question of law . . . that the LOIs in this case are not a contract." (Memo. at 9.)

To the extent that Hudson is arguing that the parties' use of the term "letter of intent" is sufficient, on its own, to defeat the Plaintiffs' contract breach claims, it is a mere reprise of an argument that failed at the Rule 12 stage. When it moved to dismiss the Plaintiffs' initial complaint, Hudson cited the same passage from *Glazer*, and it urged Judge Williams to hold that "[t]he LOIs in question here cannot be a contract." (Memo. of L. in Supp. of Mot. to Dismiss, ECF No. 16-1, at 3-5.) The judge declined to do so, however, because while "a letter of intent generally is thought to be non-binding," "the Supreme Court of Connecticut has made clear that this is not a per se rule." *Int'l Supply I*, 2024 WL 707014, at *3. "Whether parties intended to be bound by an informal contract" is not determined solely from the use of the term "letter of intent," but rather by "the factfinder's assessment of '(1) the language used, (2) the circumstances surrounding the transaction, and (3) the purpose that they sought to accomplish.'" *Id.* (quoting *Squillante v. Cap. Region Dev. Auth.*, No. HHD-CV-16-6070594-S, 2018 WL 3715671, at *4 (Conn. Super. Ct. July 18, 2018)).

To the extent that Hudson is arguing that the other written terms of the LOIs are sufficient to determine their enforceability as a matter of law, without reference to "the circumstances surrounding the transaction," that argument was likewise rejected by Judge Williams. The judge had the LOIs before him when ruling on Hudson's motion to dismiss (Exs. 1 and 2 to Mot. to Dismiss, ECF Nos. 16-3, 16-4), and he noted that they included "the name and location of the

project, the identities and business addresses of the contractor and subcontractor, a general description of the work to be performed, and the performance price." *Int'l Supply I*, 2024 WL 707014, at *4. He held that the question of whether this was a statement of "essential terms" sufficient to "form a binding contract," or "merely a partial agreement," could not be determined solely from the language used. *Id.* (citing *111 Whitney Ave., Inc. v. Comm'r of Mental Retardation*, 70 Conn. App. 692, 701 (2002)).

Hudson has not come forward with sufficient reasons to reconsider these holdings. The standard for granting reconsideration is "strict," D. Conn. L. Civ. R. 7(c)1, and reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Schrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "Under the 'law of the case' doctrine, 'when a court has ruled on an issue, that decision should be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise.'" *Wisc. Province of Soc'y of Jesus v. Cassem*, No. 3:17-cv-1477 (VLB), 2020 WL 6198485, at *1 (D. Conn. Oct. 22, 2020) (quoting *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009)). These principles apply with particular force where, as here, the case has been transferred from one judge to another, and the movant is asking the second judge to reconsider a holding by the first. *See, e.g., McCrae v. H.N.S. Mgmt. Co.*, No. 3:22-cv-217 (MEG), 2024 WL 1973431, at *12 (D. Conn. May 3, 2024) ("Having failed to persuade Judge Arterton, this Court will not give Defendant a second bite at the apple.") Hudson has come forward with no "controlling decisions or data" that Judge Williams overlooked, and by extension, it has failed to show that it is entitled to reconsideration. *Id.* ("Not only has Defendant <u>not</u> presented the Court

with any 'cogent and compelling' reasons [to reconsider], it merely copied-and-pasted the exact same argument it made in its motion to dismiss." (emphasis in original)).

Even if it were to reconsider, this Court would adhere to Judge Williams' ruling.  The judge correctly held that there is no per se rule against enforcing "letters of intent" as contracts, and indeed, the Connecticut Supreme Court so held in the principal case cited by Hudson.  *Glazer*, 274 Conn. at 77 n.33 ("This is not to say that a letter of intent cannot be a contract." (quoting *Rennick*, 77 F.3d at 315)).  While letters of intent are "[g]enerally" considered to be a memorialization of "the preliminary understandings of parties who intend in the future to enter into a contract," this is a default principle that applies only if the "circumstances" do not "suggest otherwise."  *Id.*  Put differently, "[r]egardless of the title, if the content shows that the parties intended to be bound, and the other requisites of a contract have been satisfied, it may be a contract."  *Id.*  In summary, even if this Court were to grant reconsideration, it would agree with Judge Williams that it cannot look solely at the LOIs and decide their enforceability as a matter of law.  *See Pavacich v. Genest*, No. NNH-CV-02-0467602-S, 2004 WL 504238, at *5 (Conn. Super. Ct. Feb. 23, 2004) ("A question about the existence of a contract is a question that must be decided by the finder of facts.") (citing *Pagano v. Ippoliti*, 245 Conn. 640, 654 (1998)).

Hudson argues that different standards apply to motions to dismiss and motions for summary judgment (Reply at 3-4), and that is true enough.  At the motion to dismiss stage, the Court assesses "whether a complaint's factual allegations plausibly give rise to an entitlement to relief . . . [t]hus, the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side[.]"  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).  A motion for summary judgment, by contrast, entails consideration of the evidence adduced in discovery, and of the question of whether that evidence creates a genuine

dispute of material fact requiring trial.  *See* Fed. R. Civ. P. 56.  Thus, to the extent that the Plaintiffs are arguing that Judge Williams' ruling disposed of all legal *and factual* challenges Hudson could raise (Opp'n at 10-11), they are mistaken.  But the judge did decide the question of whether the LOIs were unenforceable on their face as a matter of law, and Hudson has provided no persuasive reason to rule differently.  The Court will therefore turn to Hudson's factual challenges.

### 2.    *Hudson's factual challenges*

Hudson next argues that the evidence can add up to only one conclusion: the LOIs were not enforceable contracts.  (Memo. at 9-10.)  It makes six principal claims in support of this argument, but for reasons of analytical clarity, the Court will address them in a different order than Hudson raised them in its briefs.  First, Hudson asserts that "the parties did not agree to the terms of the alleged contract[.]"  (*Id.* at 9.)  Second, it says that it "specifically reserved the right not to be bound and have the ability to rescind the LOIs at any time[.]"  (*Id.*)  Third, Hudson says that "there was no finalized contract in writing."  (*Id.* at 10.)  Fourth and fifth, Hudson contends that the Plaintiffs never provided "the necessary prequalification documents," and "never provided any justification for their high EMR rating."  (*Id.*)  Sixth and finally, Hudson asserts that "there was no performance of the contract."  (*Id.* at 9-10.)

Hudson's first argument implicates established legal principles.  Under Connecticut law, a contract is formed when parties reach "definite agreement on the essential terms of an enforceable agreement."  *Willow Funding Co. v. Grencom Assocs.*, 63 Conn. App. 832, 845 (2001).  Stated differently, there must be a "meeting of the minds" between the parties, "defined as mutual agreement and assent of two parties to contract to substance and terms."  *Martin v. Todd Arthurs Co., Inc*., 225 Conn. App. 844, 851 (2024) (quoting *Kinity v. US Bancorp*, 212 Conn. App. 791, 824-25 (2022)).  The "existence and terms of a contract are to be determined from the intent of the

parties." *Auto Glass Express, Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 225 (2009) (quoting *MD Drilling & Blasting, Inc. v. MLS Construction, LLC*, 93 Conn. App. 451, 454 (2006)). This is not based on "the secret intention of a party but upon the intention manifested by his words or acts, and on these the other party has a right to proceed." *Conn. Light & Power Co. v. Proctor*, 324 Conn. 245, 267-68 (2016) (internal quotation marks omitted) (quoting *Nutmeg State Machinery Corp. v. Shuford*, 129 Conn. 659, 661 (1943)). "The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were." *Auto Glass Express*, 293 Conn. at 225 (quoting *MD Drilling & Blasting*, 93 Conn. App. at 454).[2]

Parties do not always have to agree on *all* terms before a court will regard their engagement as an enforceable contract. "Under the modern law of contract, if the parties so intend, they may reach a binding agreement even if some of the terms of that agreement are still indefinite." *Willow Funding Co.*, 63 Conn. App. at 844. "[C]ourts increasingly have been willing to flesh out the intended meaning of indefinite contract language by recourse to trade custom, standard usage and past dealings." *Id*. (citing 1 E. Farnsworth, Contracts (2d ed. 1988), § 3.28, p. 398); *cf. also* Conn. Gen. Stat. § 42a-2-204(3) (stating, in the context of sales of goods, that "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended

---

[2]    In its lone citation to out-of-state law, Hudson directs the Court to the New York case of *Spencer Trask Software & Information Systems, LLC v. RPost International, Ltd.,* 383 F. Supp. 2d 428, 441 (S.D.N.Y. 2003) "as a source for determining which factors are indicative of evidence of intent to be bound." (Memo. at 9.) While the Connecticut Supreme Court did cite *Spencer Trask* in *Glazer*, that case involved a claim of violation of the "duty to negotiate in good faith under New York law." 274 Conn. at 86 n.37. The Second Circuit has observed that the New York factors for determining whether parties intended to be bound are not necessarily the same as the Connecticut factors. *Omega Eng., Inc. v. Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005). In Connecticut, "[t]he parties' intent is determined from the (1) language used, (2) circumstances surrounding the transaction, including the motives of the parties, and (3) the purposes which they sought to accomplish." *Id.* (citing *Klein v. Chatfield*, 166 Conn. 76, 80 (1974)).

to make a contract and there is a reasonably certain basis for giving an appropriate remedy"). Of course, the parties must agree on the *essential* terms. *Glazer*, 274 Conn. at 51 (stating that "the plaintiff has failed to prove the existence of an agreement" if the writing is "not a complete statement of all the essential terms" (quoting *Suffield Dev. Assocs. Ltd. P'ship v. Soc'y for Sav.*, 243 Conn. 832, 843 (1998))). "Parties, however, may form a binding contract even if some nonessential terms of their agreement are indefinite or left to further negotiations." *Bayer v. Showmotion, Inc.*, 292 Conn. 381, 411 (2009).

Hudson argues that the Supply LOI is unenforceable because the parties did not agree on the price term. (*See* Memo. at 10; L.R. 56(a)1 Stmt. ¶ 13; Reply at 4.) Specifically, Hudson says that Supply "interpreted the materials LOI to mean that they would be paid $6,911,000 *plus* the allowances ($150,000 for necessary hardware and $100,000 allowance credit for anticipated value engineering of materials), while Hudson Meridian intended the materials LOI to mean that the total price was $6,911,000 *including* these allowances." (Reply at 4.) If the parties had inarguably failed to agree on the price of the transaction, that would be an important point, because Connecticut courts have generally held that price terms are essential. *E.g., Caruso v. Raffone*, No. NNH-CV05-4016645-S, 2009 WL 3416377, at *12 (Conn. Super. Ct. Sept. 28, 2009) ("Price is considered an element essential to contract formation."); *MJC Design Grp. v. Cimino*, No. NNH-CV04-0490623S, 2006 WL 3359686, at *1 (Conn. Super. Ct. Nov. 2, 2006) (same).

But this point is not inarguable on the current record. To be sure, Mr. Hooker says that Hudson "intended the LOI to mean that the total price was $6,911,000 *including* allowances." (Decl. of D. Hooker, ECF No. 82-16, ¶ 13.) Supply says, however, that the parties agreed to add the allowances back in later – and there is evidence in the summary judgment record supporting that claim. Mr. Soares filed a declaration stating that "at the [February 8, 2022] meeting it was

agreed by Supply and Hudson Meridian that the amount of the supply contract price would be $6,911,000, with a $150,000 credit for hardware and a $100,000 allowance for value engineering[.]"  (Decl. of D. Soares, ECF No. 95-2, ¶ 22.)[3]  He added that, when the LOI came to him without "the language about the $150,000 credit for hardware and a $100,000 allowance for value engineering," he called Mr. Hooker, who stated "that he could not change the supply LOI because he had to present it to the bank to obtain the construction financing *but that the language would be in the supply contract.*"  (*Id.* ¶¶ 30-31 (emphasis added).)

Hudson identifies other terms that were not agreed upon at the time of the LOIs, but it provides no reason to suppose that those terms were essential.  It explains that it sent "draft labor

_____

[3]    In its reply brief, Hudson urges the Court to disregard the Plaintiffs' declarations on the ground that they are "self-serving."  (Reply at 8-9.)  The Court will not do so, because it is well established that "at summary judgment, a plaintiff is entitled to rely on his own testimony to establish his claim."  *Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 48 (2d Cir. 2025) (alterations omitted) (quoting *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016)).  "And to hold that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off summary judgment would be to thrust the courts – at an inappropriate stage – into an adjudication on the merits."  *Knox*, 134 F.4th at 49 (alterations omitted) (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998)).

The cases cited by Hudson do not compel a different result. As relevant here, *Lujan v. National Wildlife Federation* stands only for the proposition that a non-moving party cannot avoid summary judgment by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."  497 U.S. 871, 888 (1990).  In *Chimney v. Quiros*, the court disregarded elements of a non-moving party's affidavit because they were conclusory and flatly contradicted by his own documentary evidence, not because they were made to advance his own interests.  No. 3:21-cv-321 (JAM), 2023 WL 2043290, at *3 (D. Conn. Feb. 16, 2023).  The other cases cited by Hudson make similarly anodyne points.  *Secs. & Exch. Comm. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978) ("It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to the motion."); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (holding that non-moving party may not rely "upon the mere allegations or denials" in his pleadings (quoting then-Fed. R. Civ. P. 56(e))); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993) (holding that non-moving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

Here, Mr. Soares' declaration is certainly "self-serving" in the sense that it supports his employer's cause.  But it is not conclusory or a mere cut-and-paste of the Plaintiffs' complaint.  (*See* Decl. of D. Soares, ECT No. 95-2.)

and material contracts" to the Plaintiffs on February 10, 2022, but that the Plaintiffs "requested that it be formatted to their liking, in the form of a purchase order." (L.R. 56(a)1 Stmt. ¶ 16.) Yet other evidence suggests that the difference between a "labor and materials contract" and a "purchase order" may not have been material to either side. On the current record, each side seems to have been willing to contemplate working with the other's form of documentation. Mr. Hooker wrote about issuing a "PO" on March 1, 2022 (Ex. 12 to Opp'n, ECF No. 95-17), and Mr. Soares "never requested that Mr. Hooker format the supply contract in the form of a purchase order." (Decl. of D. Soares, ECF No. 95-2, ¶ 38.) In short, the trier of fact could find on the current record that the parties agreed on the price term, and that the other issues asserted as bars to enforceability were not essential terms in the parties' contemplation at the time. Thus, Hudson is not entitled to summary judgment on the ground that "the parties did not agree to the terms of the alleged contract." (Memo. at 9.)

Hudson next argues that the LOIs are not contracts because they reserved a right of rescission (Memo. at 9), but this claim is similarly unpersuasive, for two reasons. First, the use of the term "rescind[]" does not unequivocally connote an intention not to create a binding contract, as Hudson contends. (*Id.*) Rescission, after all, "is the unmaking *of a contract.*" *Metcalf v. Talarski*, 213 Conn. 145, 153 (1989) (emphasis added) (quoting *Kavarco v. T.J.E., Inc*., 2 Conn. App. 294, 299 (1984)). As a sister circuit's Court of Appeals has explained, because a party cannot unmake what did not exist in the first place, "rescission presupposes the existence of a valid contract." *Thrash v. Countrywide Comm'l Real Estate Fin., Inc.*, 405 F. App'x 816, 820 (5th Cir. 2010) (per curiam summary order); *see also Waldner v. Carr*, 618 F.3d 838, 846 (8th Cir 2010) ("Because the parties did not have a valid contract, there was nothing to rescind."). It is therefore not at all clear that, when he chose the word "rescind[]," Mr. Hooker intended not to form a

contract.  Second, the LOI's right of rescission was not absolute, but was instead "subject to the terms of the Trade Contract."  (Exs. 5 and 6 to Opp'n, ECF Nos. 95-10, 95-11.)  Thus, it cannot be said that the rescission clause unambiguously communicated Hudson's intent not to be bound to anything.

Hudson's third argument is that the LOIs are unenforceable because "there was no finalized contract in writing" (Memo. at 10), but this claim is equally unpersuasive.  As noted above, "if the parties so intend, they may reach a binding agreement even if some of the terms of that agreement are still indefinite."  *Willow Funding Co.*, 63 Conn. App. at 844.  An agreement that leaves some nonessential terms for future negotiation is therefore not unenforceable just because the parties ultimately do not reduce those nonessential terms to writing.  Of course, Hudson contends that the missing terms were essential.  (*See* Memo. at 10.)  But the Court cannot so find on the current record, for the reasons cited above.

Hudson's remaining substantive arguments can be quickly addressed.  The claim that the Plaintiffs failed to provide "the necessary prequalification documents" or to "justif[y] their high EMR rating," and the claim that "there was no performance of the contract" (Memo. at 9-10), go to contract performance and not contract formation.  The Court therefore construes Hudson's claims as an argument that, even if the LOIs could be regarded as binding contracts, the Plaintiffs have no viable claim for breach because they breached first.  Under Connecticut law, however, only a material breach by the Plaintiffs would relieve Hudson of its own performance obligations.  *See Weiss v. Smulders*, 313 Conn. 227, 263 (2014) ("A *material* breach by one party discharges the other party's subsequent duty to perform on the contract." (emphasis added)); *see also Shah v. Cover-It, Inc.*, 86 Conn. App. 71, 75-76 (2004) ("It is a general rule of contract law that a total breach of contract by one party relieves the injured party of any further duty to perform further

obligations under the contract." (emphasis omitted) (quoting *Rokalor, Inc. v. Connecticut Eating Enterprises*, Inc., 18 Conn. App. 384, 391 (1989)); *Pack 2000, Inc. v. Cushman*, 311 Conn. 662, 675 (2014) ("[A] technical breach of the terms of a contract is excused[.]" (quoting *Pack 2000, Inc. v. Cushman*, 126 Conn. App. 339, 349 (2011)). To accept Hudson's argument, the Court would have to find that the failure to provide prequalification documentation or to justify an experience rating were material terms of the parties' agreement. *See Shah*, 86 Conn. App. at 75-76. That finding would require, in turn, consideration of the factors set forth in *Bernstein v. Nemeyer*, 213 Conn. 665, 672 (1990) and Section 241 of the Restatement (Second) of Contracts. *Id.* Hudson has provided no reason to suppose that those factors would inarguably point toward a material breach, and accordingly, its argument is unpersuasive.

Finally, Hudson raises procedural arguments about the Plaintiffs' compliance with Local Rule 56, but these arguments do not change the result. (Reply at 7-8.) Hudson correctly notes that, if the non-moving party denies an evidence-backed claim that the moving party made in its Local Rule 56(a)1 statement, the denial must be supported by a citation to admissible evidence. (*Id.* at 7); *see also* D. Conn. L. Civ. R. 56(a)3 ("Each statement of material fact . . . by an opponent in a Local Rule 56(a)2 Statement . . . must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial."). It then says that the Plaintiffs denied twenty claims without proper citation, and it asks the Court to deem those claims admitted. (Reply at 7-8 & 8 n.3) (asking the Court to deem admitted the allegations in paragraphs 6-13, 15-19, and 21-27 of Hudson's Local Rule 56(a)1 Statement). But with two exceptions, [4] each of these paragraphs was either substantially admitted already (*e.g.,*

---

[4]     The two exceptions were paragraphs 25 and 26. In paragraph 25, Hudson averred that "[n]o contract documents were ever executed by the parties." (L.R. 56(a)2(i) Stmt., ¶ 25.) The Plaintiffs "[d]enied" that statement without a specific citation to evidence, but they then noted that

L.R. 56(a)2(i) Stmt., ¶¶ 10-12) or denied with a citation to evidence.  (*Id.* ¶¶ 6-9, 13, 15-19, 21-24,

27.)  To be sure, many of the citations were to Mr. Soares' declaration, and Hudson thinks that

declaration is too "self-serving" to be relied upon, but the Court has already rejected that argument.

(*See* discussion, *supra* n.3.)  Hudson also attacks the Plaintiffs' Local Rule 53(a)2(ii) Statement of

Additional Material Facts for insufficient citation (Reply at 8), but each of the paragraphs in that

statement has a citation to a declaration or exhibit.  (*See generally* L.R. 56(a)2(ii) Stmt.)  And

finally, Hudson attacks elements of Mr. Backman's declaration as hearsay (Reply at 9-10), but the

challenged testimony concerned lumber pricing and is immaterial to the question of whether

Hudson is entitled to summary judgment.  In summary, because genuine disputes of material fact

exist, and because the Plaintiffs committed no dispositive procedural errors, Hudson is not entitled

to summary judgment on the contract breach claims in Counts One and Three.

### E.    Count Two:  Promissory Estoppel

In Count Two, Supply asserts a claim of promissory estoppel.  (Am. Compl., ECF No. 70,

at 7.)  Under Connecticut law, "any claim of estoppel is predicated on proof of two essential

elements[.]"  *Chotkowski v. State*, 240 Conn. 246, 268 (1997) (quoting *Conn. Nat'l Bank v. Voog,*

---

the "parties executed the LOIs."  (*Id.*)  In paragraph 26, Hudson claimed that "the parties were
unable to agree upon various material terms of the contracts."  (*Id.* ¶ 26.)  The Plaintiffs denied
this, again without a specific citation to admissible evidence, but stated that the parties had agreed
upon the "material terms of the contracts including the pricing . . . as reflected in the LOIs and
accompanying emails."  (*Id.*)

In arguing that paragraphs 25 and 26 should be deemed fully admitted, Hudson is
effectively arguing that the Plaintiffs should be deemed to have accepted Hudson's legal arguments
about the enforceability of the LOIs and the materiality of the omitted terms, because they did not
follow their references to the LOIs with a pinpoint citation to their place in the summary judgment
record.  The Court declines to accept this argument.  *See Chiaravallo v. Middletown Transit Dist.*,
561 F. Supp. 3d 257, 269 (D. Conn. 2021) (rejecting defendants' argument that "statements of fact
included in the Rule 56(a)(1) statement should be deemed admitted on the basis of purportedly
improper denials" because, among other reasons, "many of the defendants' statements of fact are
actually legal propositions or conclusions not properly included in a Local Rule 56(a)(1)
Statement").

233 Conn. 352, 366 (1995)).. First, "the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief[.]" *Id.* Second, "the other party must change its position in reliance on those facts, thereby incurring some injury." *Id.* A promise need not be "the equivalent of an offer to enter into a contract" to induce reliance. *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 105 (2003) (citation omitted). But the promise must be a "clear and definite" expression of a present intent to commit, rather than "a mere statement of intent to contract in the future." *Id.*

Hudson argues that it is entitled to summary judgment on Count Two because it is "impossible" that the Plaintiffs changed their position in reliance on Hudson's emailed statements. (Memo. at 11.) Although the Plaintiffs now argue that they relied upon "oral promises" (*see* Opp'n at 11-12), Hudson urges the Court to not consider those arguments. (Reply at 5.) To understand why Hudson thinks the "oral promises" argument should not be considered, it is necessary to lay out some additional background about how the promissory estoppel claim has developed over the course of the litigation.

Hudson first attacked the promissory estoppel claim at the motion to dismiss stage. (Mot. to Dismiss, ECF No. 16.) The initial complaint had described how Hudson sent the LOIs under cover of an email stating that a "formal and complete contact" would follow. (Compl., ECF No. 1, ¶ 26.) Supply went on to allege that it "entered into agreements with suppliers for materials" "[i]n reliance on the defendant's promise made in its February 8 emails[.]" (*Id.* ¶ 29.) Interpreting this as a claim of reliance on the LOIs that had been attached to the emails, Hudson moved to dismiss on the ground that the Supply LOI did not contain a sufficiently "clear and definite promise." (Memo. of L. in Supp. of Mot. to Dismiss, ECF No. 16-1, at 6.) Supply responded that the promissory estoppel claim was not entirely based on the statements made in the LOIs, but also

on the statements made in the email to which they were attached.  (Pl.'s Opp'n to Mot. to Dismiss, ECF No. 25 at 6.)  Judge Williams denied Hudson's motion to dismiss the promissory estoppel count, observing (among other things) that Hudson had "largely disregard[ed] Plaintiffs' contention that the applicable 'promise' was made in the [covering] email."  *Int'l Supply I*, 2024 WL 707014, at *6.

The Plaintiffs' "emailed promises" theory was seemingly debunked, however, when subsequent discovery revealed that Supply committed to buying Sherwood's lumber *before* Hudson sent that email.  At 4.54 p.m. on February 8, 2022, Supply sent a letter of intent to Sherwood, which "stated its 'commitment for material purchases at 201 Munson Street.'"  (L.R. 56(a)1 Stmt. ¶ 6; L.R. 56(a)2(i) Stmt., ¶ 6; Ex. 4 to Memo., ECF No. 82-5.)  Fourteen minutes after that, at 5:08 p.m., Hudson emailed the LOIs to the Plaintiffs, with Mr. Hooker stating in the body of the email that Hudson was in the process of assembling the "formal and complete contract."  (L.R. 56(a)1 Stmt. ¶ 7; L.R. 56(a)2(i) Stmt. ¶ 7; Ex. 6 to Memo., ECF No. 82-7.)  Hudson's motion for summary judgment on Count Two thus focused on the assertion that the Plaintiffs' argument at the motion to dismiss stage no longer had factual support.  Hudson said that Supply's promissory estoppel claim could not survive because "it is undisputed" that Supply acted before Hudson's statements were made, and Supply could not possibly rely to its detriment on promises that had not been made yet.  (Memo. at 11-12.)

In their opposition memorandum, the Plaintiffs responded by asserting that Supply committed to purchase the lumber in reliance on Hudson's "oral promises . . . earlier that day[.]"  (Opp'n at 12.)  The Plaintiffs contended that Supply sent its own letter of intent to Sherwood because it and Hudson had finalized the terms of the agreement orally, before the 5:08 p.m. email, and Mr. Hooker had "promised to issue the LOIs that day and not rescind that promise to do so."

(*Id.* at 13.)  In support of this claim, they provided a declaration from Mr. Soares.  (Decl. of D. Soares, ECF No. 95-2.)  In that declaration. Mr. Soares claimed that at the in-person meeting preceding the email, "Mr. Hooker advised us that both International Supply and Framers had been awarded the contracts for supply and labor and he promised that the LOIs would be issued to us that day."  (*Id.* ¶ 23.)  He added that "Mr. Hooker told us to lock in our lumber pricing with our lumber suppliers so that we would not be subject to the risk of the lumber prices rising the next day[.]"  (*Id.* ¶ 24.)  He then said that, "[b]ased upon Mr. Hooker's representations, directives and promises," he advised Hudson that "Supply would be committing to purchase the necessary supplies from our suppliers that day."  (*Id.* ¶ 26.)  He later "returned to our office in Naugatuck, Connecticut," where he "immediately prepared and emailed an LOI to our lumber supplier, Sherwood Lumber, to lock in the lumber pricing."  (*Id.* ¶ 27.)  He conceded that the Sherwood LOI preceded the written Hudson LOIs by fourteen minutes.  (*See id.* ¶¶ 28, 29.)

In reply, Hudson argues that this is a bait-and-switch, and that the Court should disregard on summary judgment.  It correctly notes that a party "cannot amend a pleading through an opposition."  (Reply at 6 (citing *Germain v. Nielsen Consumer LLC*, 655 F. Supp. 3d 164 n.6 (S.D.N.Y. 2023)).)  The operative complaint did not expressly plead reliance on the oral statements made at the in-person meeting during the day on February 8, 2022, but rather on "the defendant's promise made in its February 8 emails" that evening.  (Am. Compl., ECF No. 70, ¶ 28.)  Hudson argues that, because the complaint placed only the emails at issue, Mr. Soares' alleged facts about the oral negotiations "*are not material facts* in the record before this Court."  (Reply at 6 (emphasis in original).)

It is well established that a party may not raise entirely new allegations or theories of liability in its opposition to summary judgment.  *See, e.g., Lyman v. CSX Transp., Inc*. 364 F.

App'x 699, 702 (2d Cir. 2010) (summary order) (affirming the district court's decision not to consider "new theories of liability" that were raised for the first time in an opposition to summary judgment); *Greenidge v. Allstate Ins. Co*., 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach the merits of an argument that was raised for the first time in the plaintiff's opposition to summary judgment). There are two principal reasons a court may "brush[] aside" new claims that are raised in summary judgment oppositions. *Syracuse Broad. Corp. v. Newhouse*, 236 F.2d 522, 525 (2d Cir. 1956). First, the proper vehicle for asserting a new claim is a motion to amend the complaint, and courts do not have any obligation "to grant leave to amend a complaint without being asked to do so." *Greenidge*, 446 F.3d at 361. Second, allowing a party to bring up new claims at the summary judgment stage can frustrate "[o]ne of the core purposes" of the Federal Rules of Civil Procedure, which is to "'place opposing parties on notice' about each party's claims and defenses in order to 'prevent surprise or unfair prejudice.'" *Cannady v. Bd. of Trs. of Boilermaker-Blacksmith Nat'l Pension Tr.*, No. 20-3141-CV, 2022 WL 151298, at *5 (2d Cir. Jan. 18, 2022) (summary order) (internal quotation marks omitted) (quoting *Reives v. Lumpkin*, 632 F. App'x 34, 35 (2d Cir. 2016) (summary order)); *see also Greenidge v. Allstate Ins. Co*., 312 F. Supp. 2d 430, 437 (S.D.N.Y. 2004) (holding that because "a claim so raised deprives the adversary of the opportunity for discovery and presumptively creates prejudice," the claim "must be disregarded"), *aff'd*, 446 F.3d at 356.

These principles have been held not to apply, however, when the allegedly new claim is sufficiently related to the one that was expressly pled. True, "rais[ing] new claims in response to a motion for summary judgment is generally disfavored, due to the potential prejudice to the opposing party." *Coudert v. Janney Montgomery Scott, LLC*, No. 3:03-cv-324 (MRK), 2005 WL 1563325, at *2 (D. Conn. July 1, 2005), *aff'd*, 171 F. App'x 881 (2d Cir. 2006) (summary order).

Thus, "[c]laims that are entirely new – that is, claims based [on] new facts and new legal theories with no relation to the previously pled claims – are commonly rejected at the summary judgment stage due to the prejudice to the defendant, who may not have had fair notice of the claim and consequently may not have had an adequate opportunity for discovery." *Id.*; *see also Stiller v. Colangelo*, 221 F.R.D. 316, 317 (D. Conn. 2004) (denying leave to amend to add claims that "differ[ed] in character and purpose from those articulated in the initial complaint"). Conversely, however, "claims that are related to or are mere variations of previously pleaded claims – that is, claims based on the same nucleus of operative facts and similar legal theories as the original claims – may be raised on a motion for summary judgment where the defendant was clearly on notice from the complaint and was not unfairly prejudiced." *Coudert*, 2005 WL 1563325, at *3; *see also Hanlin v. Mitchelson*, 794 F.2d 834, 841 (2d Cir. 1986) ("Here, the new claims are merely variations on the original theme of malpractice, arising from the same set of operative facts as the original complaint."); *cf. Bader v. Special Metals Corp*., 985 F. Supp. 2d 291, 311 n.8 (N.D.N.Y. 2013) (holding that the plaintiff's claim was not a "truly 'new' claim or different theory of liability," but instead "clarified" a claim that the plaintiff already asserted in her complaint).

In considering which path to follow on this issue, courts consider the degree to which the defendant was on notice of the possibility that the plaintiff would pursue the "new" claim, and the degree to which the defendant would be prejudiced if the claim were allowed to proceed. *E.g., Coudert*, 2005 WL 1563325; *Bader*, 985 F. Supp. at 311 n.8 (considering the merits of the plaintiff's claim when the defendants had the "requisite notice that Plaintiff was, or might well be" pursuing the claim). In *Richards v. Direct Energy Servs., LLC*, for example, the plaintiff had alleged that the defendant energy supplier impermissibly "used factors that were unrelated to 'business and market conditions' to set variable rates[.]" 246 F. Supp. 3d 538, 549 (D. Conn.

2017), *aff'd*, 915 F.3d 88 (2d Cir. 2019).  His complaint went on to say that the supplier did so by using rates that did not "track[] wholesale rates," but in response to a summary judgment motion, he changed his theory and used a different set of rates "as his benchmark." *Id.*  The supplier argued that this new theory should be disregarded on summary judgment, but Judge Bolden disagreed.  "While [the plaintiff's] retreat from the 'wholesale market theory' . . . is fairly obvious, this does not mean that the Court cannot hear the new theory at all." *Id.*  Judge Bolden held that because the plaintiff had raised the theory in one of his motions, even if he had not pled it in his complaint, the supplier  had "notice" that "lessened the element of surprise or prejudice." *Id.* at 549-50.

This case presents a close call with respect to this issue.  On the one hand, both the initial and amended complaints specifically stated that Supply relied on the "February 8 emails," not on the discussions earlier that day.  (Compl., ECF No. 1, ¶ 28; Am. Compl., ECF No. 70, ¶ 28.)  And Supply doubled down on that when it opposed Hudson's motion to dismiss.  (Pl.'s Opp'n to Mot. to Dismiss, ECF No. 25 at 6.)  But on the other hand, Supply's latest theory is "based on the same nucleus of operative facts and similar legal theories as" its prior one, *Coudert*, 2005 WL 1563325, and the old and new theories are no less similar than the old and new theories at issue in *Richards*.

In the Court's view, the deciding factor on this close call is the lack of evident prejudice.  Tellingly, Hudson does not claim to have been prejudiced by the Plaintiffs' switch.  (Reply at 5-6.)  In particular, Hudson does not claim to have been lulled by paragraph 28 of the complaint into refraining from taking discovery about the oral negotiations that occurred on the morning of February 8, 2022.  (*See, e.g.,* Dep. Tr. of A. Gallagher, ECF No. 82-4, at 21 (inquiring about "meetings or conversations between" Supply and "anyone at Hudson").)  Perhaps because the Plaintiffs had put those negotiations at issue in their implied covenant claim, if not in paragraph 28 of the complaint (*see* Pl.'s Opp'n. to Mot. to Dismiss, ECF No. 25 at 5-6 (stating that "plaintiffs

. . . have alleged that the defendant . . . ma[de] promises and representations . . . that the defendant needed the plaintiffs to execute the letters of intent that bound the plaintiffs to a price for work and materials so that the defendant could secure financing for the project")), Hudson examined the Plaintiffs' deposition witnesses about them. (*See, e.g.,* A. Gallagher Dep. Tr., ECF Nos. 82-4 & 95-24, at 21:07- 24:04, 38:01-25; D. Soares Dep. Tr., ECF No. 95-25, at 24:10-12; K. Backman Dep. Tr., ECF No. 95-26, at 28:06-13.)  Because Supply's latest theory is sufficiently related to its prior one, and because the elements of lack of notice and prejudice appear to be lacking, the Court declines Hudson's invitation to disregard the Plaintiffs' claim of a promissory estoppel arising out of the parties' oral negotiations.

With that claim in play, the Court concludes that Hudson's motion to dismiss Count Two on summary judgment should be denied.  While Hudson argues that the LOIs and the covering email were insufficiently precise to form the sort of "clear and definite promise" upon which a claim for promissory estoppel could be based (Memo. at 11), it does not make the same claim about the oral negotiations (*see generally id.* and Reply at 6), and the evidence it has put into the record about those negotiations is insufficient to carry its summary judgment burden.  (*See* L.R. 56(a)1 Stmt. ¶¶ 4-5 and evidence cited therein.)  Mr. Soares and Mr. Backman both declared under penalty of perjury that on February 8, the parties reached an oral agreement upon pricing for the Supply contract, and that the Plaintiffs sent the letter of intent to Sherwood "[b]ased upon" Hudson's "representations, directives and promises."  (Decl. of D. Soares, ECF No. 95-2, ¶¶ 23, 25; Decl. of K. Backman, ECF No. 95-4, ¶¶ 19, 22.)  This and other evidence creates a genuine

dispute of material fact that cannot be resolved on summary judgment, and accordingly, Hudson's motion will be denied as to Count Two.[5]

### F.    Count Four:  Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count Four, both Plaintiffs alleged that Hudson breached the implied covenant of good faith and fair dealing.  (Am. Compl., ECF No. 70, at 8.)  The duty of good faith and fair dealing is "a covenant implied into a contract or a contractual relationship." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004) (quoting *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 566 (1984)).  "[E]very contract carries an implied duty 'requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement.'" *Id.* (quoting *Gaudio v. Griffin Health Services Corp.*, 249 Conn. 523, 564 (1999)).  To breach the covenant of good faith and fair dealing, "the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 399 (2016) (quoting *De La Concha of Hartford*, 269 Conn. at 433).  A claim for breach of the implied covenant therefore has three essential elements: "(1) two parties must engage in a contract which the plaintiff reasonably expects to benefit; (2) the benefit is in some way injured by the other

---

[5]        While discussing the contract breach claims in its Reply brief, Hudson asserted that "even if an oral agreement did exist, and Plaintiffs actually pleaded it, it would still be unenforceable under the Statute of Frauds as a contract for the sale of goods in an amount exceeding $500." (Reply at 5 n.2) citing Conn. Gen. Stat. § 42a-2-201).)  It is unclear whether Hudson intended to direct this argument to the promissory estoppel claim as well, but if it did, it is too underdeveloped for the Court to embrace.  The Connecticut appellate courts have not yet decided whether to recognize a promissory estoppel exception to the Statute of Frauds, *McClancy v. Bank of Am., N.A.*, 176 Conn. App. 408, 414-15 (2017) (citing *Glazer*, 274 Conn. at 89-90 n.38), and any discussion of whether a federal court should or should not recognize such an exception would need to be more substantial than a single-sentence statement in a footnote.  *Cf. Dayle B. v. Saul*, No. 3:20-cv-359 (TOF), 2021 WL 1660702, at *10 n.8 (D. Conn. Apr. 28, 2021) (discounting argument made cursorily in a footnote).

party's actions; and (3) these injurious actions were the product of the defendant's bad faith." *Owen v. Georgia-Pac. Corp.*, 389 F. Supp. 2d 382, 393 (D. Conn. 2005).

Hudson argues that it is entitled to summary judgment on Count Four's implied covenant claim for two reasons. It first asserts that "Connecticut law does not recognize such a cause of action arising from a mere LOI"; in other words, Hudson does not believe that there was an enforceable contract between the parties under which the Plaintiffs could reasonably expect to receive benefits. (Memo. at 12.) Hudson is of course correct that, if there is no contract, there can be no claim for breach of the implied covenant. *See Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 638 (holding that the existence of a contract is a "necessary antecedent to any claim of breach of the duty of good faith and fair dealing" (emphasis omitted) (quoting *Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 793 (2000))); *Carford v. Empire Fire & Marine Ins. Co.*, 94 Conn. App. 41, 46 (2006) ("[N]o claim of breach of the duty of good faith and fair dealing will lie for conduct that is outside of a contractual relationship."). But the Court has held that the existence of a contract cannot be resolved on summary judgment, *see* discussion, Section III.D *supra*, and it therefore cannot grant summary judgment on the implied covenant claim on the ground that no contract existed.[6] *See Glazer*, 274 Conn. at 77 (holding that "a duty of good faith and fair dealing would attach" to the portions of a letter of intent that "the parties expressly agreed . . . were binding on each of them").

---

[6]    The cases cited by Hudson are not to the contrary. In *Kopperl v. Bain*, the court did not hold that a claim for breach of the implied covenant could never arise out of an LOI under Connecticut law. (Memo. at 12 (citing No. 3:09-cv-1754 (CSH), 2010 WL 3490980, at *6 (D. Conn. Aug. 30, 2010).) Rather, the court held only that such a claim could not be maintained under Connecticut law when the letter in question promised only a future, good faith negotiation. *Kopperl*, 2010 WL 3490980, at *6. That is not the case here, because the LOIs between the Plaintiffs and Hudson were broader in scope. (Exs. 5 and 6 to Opp'n, ECF Nos. 95-10, 95-11.) And in *Owen*, the court dismissed the implied covenant claim only after finding that the plaintiff had not demonstrated the existence of a contract. 389 F. Supp. 2d at 394.

Hudson also makes a second argument in favor of summary judgment, however – it says that "Plaintiffs have failed to provide any evidence that . . . Hudson Meridian acted in 'bad faith,' such that they had 'some interested or sinister motive.'" (Memo. at 13.)  As the party moving for summary judgment, Hudson bears "the burden to demonstrate that no genuine issue of material fact exists."  *Marvel Characters,* 310 F.3d at 286.  But this burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp.*, 477 U.S. at 325.  "When the moving party meets this burden, the burden shifts to the nonmoving party to come forward with 'specific facts showing that there is a genuine issue for trial.'"  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting then-Fed. R. Civ. P. 56(e)).

In this case, the Plaintiffs have failed to meet their burden.  The section of their brief on the implied covenant claim is only five sentences long, and it does not contain a single citation to any facts or evidence, let alone to any facts or evidence that would support a claim for bad faith. (Opp'n at 13.)  After briefly recapitulating Hudson's arguments, and after agreeing with Hudson that "there can be no claim for breach of the implied covenant of good faith and fair dealing" if the LOIs are not enforceable contracts, the Plaintiffs say only that they had "allege[d] the existence of contracts between them and Hudson Meridian regardless of the defendant's characterization of the document as an unenforceable letter of intent."  (*Id.*)  It is well established, however, that "[t]he nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists." *Harnage v. Reddivari*, No. 3:17-cv-356 (AWT), 2020 WL 5549073, at *4 (D. Conn. Sept. 16, 2020) (citing *Celotex Corp.*, 477 U.S. at 324).  Moreover, even if the Court were to consider this allegation, it would not sustain the Plaintiffs' claim because the existence and breach of a

contract, standing alone, is insufficient to connote bad faith. *See, e.g., Fire-Tech, Inc. v. Archambault*, No. HHD-CV12-6036529-S, 2013 WL 2132116, at *2 (Conn. Super. Ct. Apr. 29, 2013) (striking claim for breach of the implied duty of good faith and fair dealing because it "fail[ed] to include any allegation of bad faith over and above a simple breach of contract").

Notably, the Plaintiffs failed to cite any evidence supporting the theory upon which their implied covenant claim avoided dismissal at the Rule 12 stage. In their brief in opposition to Hudson's motion to dismiss, the Plaintiffs substantially alleged that Hudson entered into enforceable contracts with no intention of ever performing them, and that Hudson's whole purpose was merely to secure a piece of paper with which it could mislead its bank. (*See* Opp'n to Mot. to Dismiss, ECF No. 25, at 7 ("The plaintiffs have alleged . . . that defendant acted in a deceptive manner to enable it to secure financing for the project by using the plaintiffs' commitments for work and material for an agreed price[.]").) Judge Williams accepted this argument at the pleading stage. *Int'l Supply I*, 2024 WL 707014, at *6 ("As pleaded, it is reasonable to infer that Defendant had no intention to perform its end of the bargain and instead acted with a sinister or deceptive motive by compelling Plaintiffs to sign the letters of intent only to rescind the contracts once it was able to secure financing."). At summary judgment, however, "[t]he time has come . . . 'to put up or shut up.'" *Weinstock*, 224 F.3d at 41 (quoting Fleming James, Jr. & Geoffrey C. Hazard, Jr., *Civil Procedure* 150 (2d ed. 1977)). "Accordingly, unsupported allegations do not create a material issue of fact" sufficient to defeat summary judgment. *Id.* (citing *Goenaga*, 51 F.3d at 18). Here, the Plaintiffs' brief does not even cite the allegation, let alone any evidence supporting it (*see* Opp'n at 13), and the Court is not required to comb through the voluminous exhibits for potential evidence supporting an argument that the nonmoving party has not made. *See Aiello v. Stamford Hosp.*, 487 F. App'x 677, 678 (2d Cir. 2012) (summary order) (holding that a litigant

had waived an argument not made in his summary judgment opposition, because "[t]he premise of our adversarial system is that federal courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them") (brackets, quotation marks, and citation omitted); *McRae v. H.N.S. Mgmt. Co.*, No. 3:22-cv-217 (MEG), 2024 WL 1973431, at *3 (D. Conn. May 3, 2024) ("It is not the role of the Court to search the summary judgment record for evidence supporting a party's position."). Hudson's motion will therefore be granted as to Count Four.

### G.    Count Five:  Violation of the Connecticut Unfair Trade Practices Act

Hudson contends that the Court should dismiss the Plaintiffs' CUTPA claim as well. (Memo. at 13-14.)   CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or business." Conn. Gen. Stat. § 42-110b(a).   The statute does not define "unfair" or "deceptive," but the Connecticut Supreme Court has adopted the criteria set out in the Federal Trade Commission's "cigarette rule."[7] *Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc*., 296 Conn. 315, 350 (2010). The cigarette rule enumerates three factors that courts should weigh: (1) "[w]hether the practice without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;" (2) whether the practice "is immoral, unethical, oppressive, or unscrupulous;" and (3) whether the practice "causes substantial injury to consumers, [competitors or other businesspersons] . . . ." *Id.* (alterations in original) (quoting *Ramirez v. Health Net of the Northeast, Inc.*, 285 Conn. 1, 18-19

---

[7]      Though the Federal Trade Commission no longer applies the cigarette rule, "the cigarette rule remains the operative standard for unfair trade practice claims under CUTPA."  *Kent Literary Club of Wesleyan Univ. at Middletown v. Wesleyan Univ.*, 338 Conn. 189, 231-32 (2021).

(2008)). All three factors need not be present for a practice to be considered unfair. "[A] practice may violate CUTPA because of the degree to which it meets one factor, or because, to a lesser extent, it meets all three." *Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d 99, 134 (D. Conn. 2024).

Hudson argues that it is entitled to summary judgment on the Plaintiffs' CUTPA claim. (Memo. at 13-14.) It correctly notes that under Second Circuit precedent, "a simple contract breach is not sufficient to establish a violation of CUTPA, particularly where . . . [the plaintiff has] not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy." (*Id.* at 14) (quoting *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038-39 (2d Cir. 1995)). It then adds that the Plaintiffs' "pleadings and evidence produced have not established conduct that would be 'unfair' or 'deceptive' for purposes of CUTPA." (Memo. at 14.)[8]

In their opposition memorandum, the Plaintiffs' discussion of the CUTPA claim was even more terse than their discussion of the implied covenant claim. (Opp'n at 14.) Whereas the latter was five sentences long, the former was only three, and two of those sentences merely recapitulated Hudson's argument. (*Id.* at 14.) Thus, the Plaintiffs' entire argument for avoiding summary judgment was but a single sentence: "However, the plaintiffs have provided evidence that Hudson Meridian engaged in unfair and deceptive practices that harmed the plaintiffs, including documents and deposition testimony how Hudson Meridian secretly negotiated to purchase Project materials with the same suppliers that International Supply had already committed to buying from." (*Id.*)

This single sentence does not meet the Plaintiffs' burden. Hudson met its initial summary judgment burden by pointing out that the Plaintiffs lack evidence of an unfair or deceptive trade

---

[8]    Hudson also argues that the Plaintiffs have failed to satisfy CUTPA's "ascertainable loss" requirement. (Memo. at 14.) Because the Court will accept Hudson's first argument, it does not need to resolve this second argument.

practice. (Opp'n at 14 ("[T]heir pleadings and evidence produced have not established conduct that would be 'unfair' or 'deceptive' for purposes of CUTPA.")); *see also Celotex Corp.*, 477 U.S. at 325 (holding that, on issues as to which the nonmoving party will bear the burden of proof at trial, the moving party meets its initial burden by pointing out the "absence of evidence to support the nonmoving party's case"). The burden therefore shifted to the Plaintiffs "to come forward with 'specific facts showing that there is a genuine issue for trial,'" *PepsiCo, Inc.,* 315 F.3d at 105 (quoting then-Fed. R. Civ. P. 56(e)), and that burden is not met by vague statements that evidence exists somewhere in the record. Again, it is not this Court's purview to search the record for evidence—that responsibility belongs to the litigants that appear before it.

Moreover, the Plaintiffs have not shown that their theory would establish a CUTPA violation, even if they had properly supported it with citations to admissible evidence. Although it was not required to do so, the Court has examined the record for any allusions to this theory, and it has identified only two: (1) a statement that Hudson replaced the Framing LOI with "a contract with another framing contractor . . . the same day as the rescission letters," and (2) a statement that Hudson replaced the Supply LOI with a "contract with BFS Group, f/k/a National Lumber," more than a month later. (L.R. 56(a)2(ii) Stmt. ¶¶ 57, 58.) But the Plaintiffs cite no legal authority for the proposition that replacing a supplier converts a contract breach into a CUTPA violation under these circumstances. (Opp'n at 14.) Hudson is entitled to summary judgment on the CUTPA claim in Count Five.

## IV.    CONCLUSION AND ORDER

For the reasons stated in Sections III.D and III.E, the motion of the defendant, Hudson Meridian Construction Group, LLC, for summary judgment (ECF No. 82) is **DENIED** with respect to the contract breach claims in Counts One, Two, and Three of the Amended Complaint

of the Plaintiffs, International Building Supply, LLC f/k/a International Supply, LLC, and International Framers, LLC.[9]   For the reasons stated in Section III.F, Hudson's motion is **GRANTED** with respect to Count Four.  And for the reasons stated in Section III.G, Hudson's motion is **GRANTED** with respect to Count Five.   Counts Four and Five are ordered **DISMISSED.**

The following schedule is **ORDERED** with respect to the Joint Trial Memorandum and trial:

A.     The parties shall submit their Joint Trial Memorandum by 5:00 p.m. on Wednesday, July 16, 2025.    The required contents of the memorandum are listed in the Standing Order Regarding Trial Memoranda in Civil Cases, a copy of which may be found on the District of Connecticut website at www.ctd.uscourts.gov.  The parties are respectfully reminded that, under the Standing Order, any motions *in limine* must be submitted contemporaneously with the Joint Trial Memorandum.  This means, among other things, that the parties should exchange witness and exhibit lists well in advance of the July 16th due date, so that evidentiary issues can be identified and conferred over beforehand.

B.     Memoranda in opposition to any motions *in limine* shall be filed by 5:00 p.m. on Wednesday, July 23, 2025.  No reply briefs will be permitted unless the Court requests them.

C.     The Court will hold a final pretrial conference on Wednesday, July 30, 2025 at 12:30 p.m. in the East Courtroom, United States District Court, Abraham A. Ribicoff Federal

---

[9]     Although the Court has observed genuine disputes of material fact in those counts, nothing in this opinion should be construed as any sort of prediction on how it will resolve those disputes when it serves as fact finder at the forthcoming bench trial.  At summary judgment, the Court does not make credibility determinations or weigh the evidence, and it must "assess the record in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor."  *Weinstock*, 224 F.3d at 41.  Those constraints will not apply at trial.

Building, 450 Main St., Hartford, CT, 06103.  Counsel should be prepared to argue any motions *in limine* that have not been ruled upon on the papers, and should be prepared to identify and discuss any issues that may interfere with the orderly and efficient presentation of evidence at trial.

D.      Trial will begin at 9:00 a.m. on Monday, August 4, 2025 in the East Courtroom.

So ordered this 21st day of June, 2025, at Hartford, Connecticut.


                                        */s/ Thomas O. Farrish*
                                        _____
                                        Hon. Thomas O. Farrish
                                        United States Magistrate Judge