**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| International Building Supply, LLC f/k/a<br>International Supply, LLC, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>Hudson Meridian Construction Group, LLC,<br><br>                Defendant. | Civil No. 3:22-cv-01167 (TOF)<br><br><br>November 6, 2025 |

**MEMORANDUM OF DECISION**

      This case arises out of a construction industry dispute.  The Plaintiffs are two affiliated companies, International Building Supply, LLC f/k/a International Supply, LLC ("Supply") and International Framers, LLC ("Framers" and, together with Supply, "Plaintiffs").  The Defendant is Hudson Meridian Construction Group, LLC ("Hudson").  The Plaintiffs filed a five-count complaint against Hudson in September of 2022, alleging breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA").  (Compl., ECF No. 1.)  The Court granted summary judgment on the implied covenant and CUTPA claims on June 21, 2025.  (Ruling and Order on Def.'s Mot. for Summ. J., ECF No. 98.)  The parties then tried the remaining three counts to the Court over three days in August.  (*See* Minute Entries, ECF Nos. 112-14.)

      The Court has carefully considered the witnesses' testimony, the documentary exhibits, the parties' stipulations of fact, and the post-hearing briefs that the parties submitted in September.  For the reasons set forth below, the Court will rule for Hudson on all three remaining counts of the Plaintiffs' operative complaint.

## I.    PROCEDURAL POSTURE

The Court begins by setting forth the relevant procedural history of the case.  The Plaintiffs filed their initial complaint on September 15, 2022. (Compl., ECF No. 1.)  They alleged that Hudson made, and later breached, two contracts with respect to a residential real estate development project at 201 Munson Street and 23 Shelton Avenue in New Haven, Connecticut (the "Project").  (*See id.*)  Specifically, they claimed that Hudson had agreed to buy wood framing materials for the Project from Supply, and to procure the installation labor from Framers, in two letters of intent dated February 8, 2022.  (*Id.* Counts One and Three.)  They alleged that these letters of intent were binding contracts, which Hudson breached when it purported to rescind them in June of 2022.  (*Id.*)  The Plaintiffs' five-count complaint alleged breach of the Supply contract in Count One, promissory estoppel as to Supply in Count Two, breach of the Framers contract in Count Three, breach of the covenant of good faith and fair dealing in Count Four, and violations of CUTPA in Count Five.  (*Id.* Counts One through Five.)  The Clerk of the Court initially assigned the case to the Honorable Omar A. Williams.

Hudson appeared through counsel on October 13, 2022.  (ECF Nos. 9, 10.)  On November 17, 2022, it moved to dismiss the entire complaint for failure to state a claim upon which relief could be granted.  (Mot. to Dismiss, ECF No. 16.)  After full briefing (ECF Nos. 16, 25, 28), Judge Williams denied Hudson's motion in a fifteen-page ruling dated February 21, 2024.  (Ruling on Def.'s Mot. to Dismiss, ECF No. 33); *Int'l Supply, LLC v. Hudson Meridian Constr. Grp., LLC* ("*Int'l Supply I*"), No. 3:22-cv-1167 (OAW), 2024 WL 707014 (D. Conn. Feb. 21, 2024).  Hudson then answered the complaint on March 6, 2024.  (ECF No. 37.)

On April 17, 2024, the parties "consent[ed] to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial

proceedings." (Notice, ECF No. 43.) Judge Williams transferred the case to the undersigned the next day. (Reference Order, ECF No. 44.)

On December 31, 2024, the Plaintiffs moved for leave to amend their complaint with Hudson's consent. (Am. Compl., ECF No. 70.) The motion was evidently prompted by a change in Supply's legal name (*id.* ¶ 24), but the proposed amended complaint also added some factual allegations to the then-existing five-count framework, and it withdrew the jury demand that had been made in the original complaint. (*Id.* at pp. 6, 10.) The Court granted leave to amend, making the Amended Complaint the operative pleading. (ECF No. 71.)

A few days later, the Plaintiffs sought to reinstate their jury demand by way of a proposed Second Amended Complaint. (*See* Mot. to File 2d Am. Compl., ECF No. 74.) A brief dispute then ensued over whether they could properly do so under Rule 39. (*See* Def.'s Obj., ECF No. 80.) Ultimately, however, the Plaintiffs concluded that they wanted a bench trial after all (Br. Stmt. Re: Trial Preference, ECF No. 92), mooting their request to file a second amendment. (ECF No. 93.) Hudson answered the Amended Complaint on March 4, 2025 (ECF No. 94), and the pleadings closed.

The parties completed discovery, and Hudson moved for summary judgment on all five counts. (Mot. for Summ. J., ECF No. 82.) The Plaintiffs filed an objection to Hudson's motion (Obj., ECF No. 95), and Hudson filed a reply. (Reply, ECF No. 96.) The parties argued the motion on April 17, 2025. (ECF No. 97.) On June 21, 2025, the Court issued a forty-page ruling denying the motion as to the contract breach and promissory estoppel claims in Counts One through Three, but granting it as to the implied covenant and CUTPA claims in Counts Four and Five. (Ruling and Order on Def.'s Mot. for Summ. J., ECF No. 98); *Int'l Bldg. Supply, LLC v. Hudson Meridian*

*Constr. Grp.* ("*Int'l Supply II*"), No. 3:22-cv-1167 (TOF), 2025 WL 1726365 (D. Conn. June 21, 2025).

The parties then filed their Joint Trial Memorandum on July 16, 2025. (Joint Trial Memo., ECF No. 105.) In their memorandum, they stipulated to sixteen facts about themselves, their employees, and the Project. (*Id.* at 13-14) (hereinafter "Stipulation"). On Friday, August 1, 2025, the Court ruled upon the motions *in limine* that had been filed contemporaneously with the Joint Trial Memorandum. (Order, ECF No. 109.) Trial began the following Monday, August 4, 2025. (Minute Entry, ECF No. 112.)

At the trial, the Plaintiffs presented testimony from seven witnesses: (1) Daniel Soares, their vice president of finance and operations; (2) Kristopher Backman, their director of manufacturing; (3) Anthony Gallagher, their owner; (4) Daniel Hooker, Hudson's senior project manager and vice president; (5) Kyle Little, the chief operating officer of one of their vendors, Sherwood Lumber; (6) Chris Schultz, a salesperson for National Lumber, a supplier-turned-competitor; and (7) Patrick Harkin, one of their construction estimators. (Trial Transcript, ECF Nos. 120-22) (hereinafter "Tr."). The Plaintiffs also submitted thirty-nine documentary exhibits into evidence. (ECF No. 110; *see also* Pls.' Ex. List, ECF No. 115.) For its part, Hudson presented testimony from two witnesses: (1) Walter Haass, its senior vice president of risk management, and (2) Steven Calicchio, its senior vice president and director of operations. (Tr. 343-435.) Hudson also introduced seventeen documentary exhibits. (Def.'s Ex. List, ECF No. 117.) At the close of evidence on Wednesday, August 6, 2025, counsel agreed that in performing its fact-finding function, the Court could consider any of the fifty-six admitted exhibits even if they had not been referenced in the witnesses' testimony. (Tr. 436:6-11.)

After both parties rested, their counsel asked for leave to submit post-trial briefs. (Tr. 437:25-438:3.) The Court granted leave (Order, ECF No. 119), and the parties filed their briefs on September 8, 2025. (Pls.' Post Trial Memo., ECF No. 124; Def.'s Post-Trial Br., ECF No. 123.) The case is now ripe for decision.

## II.    FINDINGS OF FACT

Rule 52(a) of the Federal Rules of Civil Procedure provides that, "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially[.]" Fed. R. Civ. P. 52(a)(1). The Court is obligated to find only those facts that are "material to the resolution of the parties' claims." *Clark v. Quiros*, No. 3:19-cv-575 (VAB), 2024 WL 3552472, at *5 (D. Conn. July 26, 2024) (quoting *Cliffstar Corp. v. Alpine Foods, LLC*, No. 09-cv-690 (JJM), 2016 WL 2640342, at *1 (W.D.N.Y. May 10, 2016)), *reversed and remanded on other grounds sub nom. Clark v. Valletta*, __ F.4th __, 2025 WL 2825324 (2d Cir. Oct. 6, 2025). Stated another way, "courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach." *I.N.S. v. Bagamasbad*, 429 U.S. 24, 25 (1976). In this Section II, therefore, the Court will find those facts that are necessary to the resolution it reaches. It will not determine those factual disputes that were presented at trial but are unnecessary to that resolution—for example, the amount of the Plaintiffs' damage claims.

Findings of fact and conclusions of law must be stated separately. Fed. R. Civ. P. 52(a)(1) (stating that the district court must "find the facts specially and state its conclusions of law separately"). With that said, the distinction between law and fact can sometimes be "anything but clear-cut." *Clark*, 2024 WL 3552472, at *5 (quoting *Cliffstar*, 2016 WL 2640342, at *1); 9 Moore's Federal Practice § 52.15[1] (Matthew Bender 3d ed. 2024) (same). For this reason, while the Court will endeavor to set forth its factual findings in this Section II, it may make certain

subordinate findings while reaching its conclusions of law in Section III. *See Negron v. Mallon Chevrolet, Inc.*, No. 3:08-cv-182 (TPS), 2011 WL 6002082, at *1 (D. Conn. Nov. 30, 2011); *cf. also March v. United States*, No. 3:17-cv-2028 (VAB), 2021 WL 848723, at *6 (D. Conn. Mar. 5, 2021) ("[F]or purposes of appellate review, the labels of fact and law assigned should not be considered controlling." (citation and quotation marks omitted)).  To the extent that the Court makes such findings in Section III, they are incorporated into this Section II by reference.

In performing its fact-finding function during and after a bench trial, the Court may decide "whose testimony to credit" and "which . . . inferences to draw[.]" *Chacko v. DynAir Servs., Inc.*, 272 F. App'x 111, 112 (2d Cir. 2008) (summary order).  Moreover, "as trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Krist v. Kolombos Rest., Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) (citation and quotation marks omitted).[1]  "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and [a] reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).

---

[1]      In their post-trial brief, the Plaintiffs cited the maxim *falsus in uno, falsus in omnibus* in pursuit of an argument that the Court should entirely disregard the testimony of Hudson's senior vice president, Mr. Calicchio.  (Pls.' Post Trial Memo., ECF No. 124, at 23.)  While the Court found much of Mr. Calicchio's testimony to be unworthy of belief, the Plaintiffs are mistaken when they suggest that even the credible parts must therefore be ignored.  *Krist*, 688 F.3d at 95; *see also United States v. Hines*, 140 F.4th 105, 114 (2d Cir. 2025) (holding, in the context of a suppression hearing in a criminal case, that "it is the province of the district court . . . to assess a witness's credibility, including his or her demeanor, in determining whether to accept all, some, or none of that testimony in light of any inconsistencies in the witness's recitation of the facts").

The Plaintiffs cite *State v. Schafer* as additional authority for their argument (Pls.' Post Trial Memo., ECF No. 124, at 23), but that case merely held that instructing a jury on the maxim "is within the discretion of the court[.]" 5 Conn. Cir. Ct. 669, 683-84, 260 A.2d 623, 631 (1969). The opinion adds that, even in 1969, "[t]he maxim [was] treated with tolerance and sufferance, laboring under faint praise and being generally regarded as of little assistance" to factfinders. *Id.* at 684; 260 A.2d at 631.

The Court has carefully considered the Stipulation and the fifty-six documentary exhibits. It has also carefully considered the testimony of the nine witnesses, and it has evaluated the credibility of each witness's testimony.  Finally, it has carefully considered the claims and arguments made about the documents and testimony in the parties' post-trial briefs.  Having done all this, the Court now makes the following factual findings.

### A.    The Parties and Jurisdiction

Framers is a Connecticut limited liability company that was formed in 2013.  (Stipulation ¶ 1.)  It provides framing labor to large commercial and residential construction projects in New England, New York, and New Jersey.  (*Id.*)  Anthony Gallagher is its sole member, and he is a citizen of Connecticut.  (*Id.* ¶ 3.)

Supply is a Connecticut limited liability company that was formed in 2021.  (*Id.* ¶ 2.)  It supplies construction materials to large commercial and residential construction projects in New England, New York, and New Jersey.  (*Id.*)  Anthony Gallagher is the sole member of Supply as well as Framers, and again, he is a citizen of Connecticut.  (*Id.* ¶ 3.)

Hudson is a New York limited liability company that was formed in 2002.  (*Id.* ¶ 4.)  Its sole member is Cote Construction Group, LLC, another New York limited liability company.  (*Id.* ¶ 5.)  Cote Construction Group, LLC's sole member is William I. Cote, a New Jersey citizen.  (*Id.*)

Supply asserted that it was damaged by Hudson's alleged breach of contract in the amount of $1,132,000.  (*E.g.,* Tr. 64:10-11, 133:6-10.)  Framers asserted that it was damaged by Hudson's alleged breach in the amount of $646,000.  (Tr. 64:14-17.)  Thus, the amount in controversy at the trial was $1,778,000.

### B.    The Project

In 2019, developers formed a plan to build a housing development at 201 Hudson St. in New Haven.  (*See* Tr. 8:25-9:5.)  The plan envisioned roughly 400 apartment units and 21 townhomes.  (Tr. 10:1-2.)  Hudson was originally slated to be the general contractor.  (Tr. 9:18-24.)  In early 2020, Hudson solicited bids from subcontractors (*e.g.*, Ex. 1, Ex. 2), but the COVID-19 pandemic prevented the Project from moving forward at that time.  (Tr. 16:17-20.)

Planning for the Project resumed in 2021.  (Tr. 18:14-19.)  Whereas Hudson had only been slated for the general contractor role in the 2019-20 plan, in the 2021 plan its corporate affiliate, 201 Munson Owner LLC, served as the developer as well.  (Tr. 160:20-24.)  Construction began in the fall of 2022.  (Tr. 180:16-18.)  The Project was substantially complete by the time of trial.  (Tr. 215:16-21.)

### C.    The Parties' Dealings About the Project

#### 1.    Events before February 8, 2022

Hudson first asked Framers to bid on the Project in 2019.  (Tr. 9:3-5.)  On January 21, 2020, Framers submitted a bid to supply the framing materials and labor for $8,058,355 (Ex. 1), but  Hudson did not accept that proposal.  (Tr. 14:2.)  On February 3, 2020, Framers made a second proposal in the amount of $7,472,000 (Ex. 2), but Hudson did not accept that proposal either.  (Tr. 14:19-21.)  Sometime between February 3, 2020 and March 11, 2020, Framers made a third proposal for $7,150,000.  (*See* Ex. 3.)  Supply was not involved in any of these bids, because it had not yet been formed.  (Stipulation ¶ 2.)

In response to the third proposal, Hudson issued a letter of intent on March 11, 2020, stating its "intent to enter into a Contract with [Framers] for the furnishing and installation of Wood Truss and Rough Carpentry per plans and specifications at the . . . project" for a price of $7,150,000.

(Ex. 3.)  The letter added that a "contract" would be "sent to [Framers'] attention with all details shortly." (*Id.*)  It then went on to say that the "agreement [was] contingent upon the sub-contractors [*sic*] successful completion of Hudson Meridian Construction Group Prequalification process." (*Id.*)  Finally, the letter stated that it could "be rescinded by the owner with a 7 days' notice." (*Id.*)  The letter was signed by Hudson's vice president and general manager, Phil Pignatelli, and countersigned by Anthony Gallagher on behalf of Framers on March 17, 2020. (*Id.*)

Hudson then sent Framers a proposed "trade contract" on March 23, 2020.  (Ex. 4.)  Framers did not accept or sign Hudson's proposed form of trade contract  (Ex. 4),[2] although it did complete the prequalification process contemplated by the letter of intent.  (Tr. 17:7-13.)  The Project then shut down sometime in the early spring of 2020 due to the COVID-19 pandemic.  (*See* Tr. 17:14-16.)  After the shutdown, Framers did not attempt to enforce the March 11, 2020 letter of intent (Tr. 16:21-25), and the trial record included no persuasive evidence that Framers then regarded the letter of intent as an enforceable contract.

Hudson did not reengage with Framers until the summer of 2021.  (Tr. 17:23-24; Ex. 6.)  On August 30, 2021, Framers made a proposal to supply the framing materials and labor for the Project for a price of $10,938,231.  (Tr. 20:9-14; Ex. 7.)  Hudson rejected that bid because the price was too high.  (Tr. 20:21.)  Framers made yet another proposal on October 11, 2021, this time for $9,966,070.  (Tr. 21:2-7; Ex. 8.)  Hudson did not accept that bid either, but rather than

---

[2]    Mr. Soares testified that Framers signed the contract "to [his] knowledge" (Tr. 16:11-13), which the Court interpreted as him saying that someone told him the contract had been signed. The Court did not credit this claim, in part because (a) the only copy that entered into evidence is unsigned (Ex. 4), and (b) the trade contract contained terms that the Plaintiffs would later cross out when Hudson proposed them again in 2022.  (*Compare id.* at Bates p. 165 (trade contract containing indemnity provision running in favor of Hudson) *with* Ex. M at Bates p. HM_000261 (Plaintiffs' mark-up copy of contract proposed by Hudson in 2022, crossing out similar indemnity clause).)

end negotiations, it asked Framers to break its proposal down into separate materials and labor bids. (Tr. 21:21-25; Ex. 11 at Bates p. 137.) Framers then made a labor-only proposal of $3,131,760 on January 25, 2022. (Ex. 9.) The parties then added some additional labor items, and Framers made another labor-only proposal for $3,258,700 on February 4, 2022. (Ex. 10; Tr. 182:13-21.)

Supply had been formed by this point (Stipulation ¶ 2), and by February 7, 2022 it had made a three-part materials proposal totaling no more than $7,111,754.83. First, it offered to provide the lumber items listed in Exhibit 16 for $4,541,348.61. (Ex. 16.) Second, it offered to provide the roof trusses and related items referenced in Exhibit 18 for $2,320,406.22. (Ex. 18.) And third, while it had not yet developed an exact quote on the installation hardware, it "guaranteed" Hudson that the cost of these items would not exceed $250,000.00. (Ex. 17.)

### 2.    *Events on and after February 8, 2022 pertaining to Supply's contract breach claim*

Hudson set up a meeting at its White Plains, New York office on the morning of February 8, 2022 to resolve the proposals. (Tr. 32:20-33:3, 168:5-6.) Messrs. Hooker and Calicchio attended the meeting for Hudson, along with the company's former president, Peter Monte, and its procurement director.[3] (Tr. 167:5-15.) Messrs. Soares and Backman attended for the Plaintiffs, along with field operations manager Joseph Gallagher. (Tr. 33:4-11.) Eamonn Gallagher, the Plaintiffs' chief estimator, attended the meeting remotely. (Tr. 11:25, 33:8.)

Both sides were anxious to reach agreement on a price for the materials portion of the Project. On the one hand, Hudson had a "target" of $7,000,000 for that portion,[4] and the best quote

---

[3]    The procurement director's name was given as "Ruben." No witness testified as to his last name. (Tr. 33:18, 115:9, 167:13, 273:25.)

[4]    At trial, the parties vigorously disputed whether the $7,000,000 figure was Hudson's own target price, or whether it had been dictated to it by its lenders. (*Compare* Tr. 22:2-7, 33:23-25,

it had yet heard from Supply exceeded that target by over $100,000.  (Tr. 168:23-169:2, 261:8-10.)  On the other hand, Supply's proposal was based on a quote from its own supplier, Sherwood Lumber, that expired at end of the day.  (Tr. 113:17-18, 114:16-17.)

The parties held their meeting, and afterward, Mr. Hooker e-mailed a letter of intent to Mr. Soares at 5:08 p.m.  (Exs. 20, 21) (hereinafter "Supply LOI").  The letter "confirm[ed Hudson's] intent to enter into a Contract with [Supply] for Furnish of Framing Material/Trusses/ Hardware/Building Wrap" for the 201 Munson Street project "for the Contract Price" of $6,911,000.  (Ex. 21.)  The letter also stated that a "final Trade Contract" would be "forwarded" to Supply "shortly," and it added that it could be "rescinded by Hudson Meridian at any time, subject to the terms of the Trade Contract."  (*Id.*)  Finally, the letter provided a signature block in which Supply could confirm its "accept[ance] and agree[ment]," and it stated that "[b]y execution of this Letter of Intent," Supply would be "agree[ing] to the Contract Price."  (*Id.*)

Mr. Soares did not immediately countersign and return the letter.  Later that evening, he disputed that the Supply LOI accurately reflected the parties' discussions about the price term for the materials portion of the job.  (*See* Ex. 20, at Bates p. 472.)  At the meeting, the parties had discussed "allowances" for hardware and "value engineering."[5]  In the 5:08 p.m. e-mail to which the Supply LOI had been attached, Mr. Hooker had stated that a $150,000 allowance for hardware

---

35:14-16, 106:24-25, 113:9-18 *with* 168:23-169:2, 379:23-380:2.)  To the extent that it is necessary to resolve the dispute, the Court finds that the Plaintiffs did not prove by the preponderance of the evidence that the lenders dictated the figure.

[5]    Hudson had provided project drawings to the Plaintiffs in 2020.  (*See* Ex. 16, at 1.)  In preparing its bids in 2022, Supply had worked off these drawings, but it had also "proposed some value engineering which could save [Hudson] money."  (Tr. 113:12-13.)  In other words, Supply thought the job could be done with less lumber than Hudson had projected, and its price quotes reflected that assumption.  A "value engineering allowance" was therefore contemplated as a contingency term in case Hudson's engineer did not approve Supply's suggested reductions.  (Tr. 116:8-10; *see also* Ex. D at Bates p. HM_001232.)

and a $100,000 allowance for value engineering had been "include[d]" in the $6,911,000 price. (*Id.* at Bates p. 470.)  Mr. Soares protested that both allowances should be on top of, rather than included in, the $6,911,000 figure.  (*See* Tr. 35:20-21.)  Mr. Hooker responded by e-mail at 9:16 p.m. that he could not "change the letter of intent as [he] need[ed] to show it to the Bank with that contract amount." (Ex. 20 at Bates p. 472.)  But he stated that he would "issue . . . a contract" the next day that would "state there is a $150,000 allowance included for necessary hardware and an add alternate for $100,000 if the Value Engineering reduction . . . is not achievable and approved by the architect/engineer."  (*Id.*)

On February 10, 2022, Hudson sent Supply a proposed contract.  (Ex. D; Tr. 230:10-23.) The draft contract contemplated that Supply would be paid a "Subcontract Price" of $6,911,000 "for the satisfactory performance and completion of the work and all of the Subcontractor's duties, obligations and responsibilities under the Subcontract Documents[.]"  (Ex. D at Bates p. HM_001154.)  With respect to allowances, the draft stated that "Subcontractor shall include in the Subcontract Price all allowances stated in the Subcontract Documents."  (*Id.*)  The draft had an "add alternate" in the amount of "no more than $100,000" if Supply's proposed "value engineering [was] not approved by the Architect/Engineer" (*id.* at Bates p. HM_001232), but it did not state that a $150,000 hardware allowance would be paid over and above the $6,911,000 "Subcontract Price."  (*See id.* at Bates p. HM_001154.)  Nevertheless, Mr. Soares signed the Supply LOI the next day, thereby "accept[ing] and agree[ing]" to its terms on behalf of Supply.  (Ex. 25.)

Hudson sent Supply another proposed form of contract on March 16, 2022.  (Ex. L.)  That draft contract stated that the "Contract Price" of $6,911,000 was for the furnishing and delivery of "Framing Material/Trusses/Hardware/Building Wrap at 201 Munson St.," and it added that the price "include[d] an allowance of $150,000 for the furnish and delivery of all needed hardware,

glue, etc. for a complete install." (*Id.* at Bates p. HM_000007.)  Supply marked up the draft and returned its version to Hudson nine days later, on March 25, 2022.  (Ex. M.)  It proposed dozens if not hundreds of changes to the document, but it did not propose to change the term that the Contract Price "include[d]" the hardware allowance.  (*Id.* at Bates p. HM_000260.)

Over the ensuing weeks, both sides became anxious about the absence of an executed, long-form contract.  For its part, Hudson began to negotiate with other materials suppliers in late April 2022.  (Tr. 256:16-24.)  On the other hand, Supply became concerned enough to pay a personal visit to Hudson's construction trailer on June 15, 2022.  (Tr. 135:25 136:18.)

At the June 15, 2022 meeting, Hudson advised Supply that it was being replaced by a different materials supplier.  (Tr. 137:6-7.)  Supply asked whether there was anything that could be done, but Hudson said there was not.  (Tr. 137:9-16.)  Later that day, Hudson sent Supply a letter "rescinding and terminating" the Supply LOI.  (Ex. 37.)  Among other reasons for the rescission/termination, the letter stated that the parties had been "unable to agree upon various important terms" and had "significant differences re the current price of materials[.]" (*Id.*)  Supply filed this lawsuit three months later.  (Compl., ECF No. 1.)

Having considered all the evidence presented about these negotiations, and having assessed the credibility thereof, the Court first finds that Supply and Hudson reached agreement on a quantity term on February 8, 2022.  Specifically, it finds for Supply on the hotly-contested issue of whether the proposed transaction contemplated a "materials list" as Supply contended, or a "turnkey" or "lump sum" deal as Hudson argued, [6] for several reasons.  First, the Supply LOI does

---

[6]    Construction materials suppliers translate the developer's engineering drawings into a list of materials anticipated for the project in a process known as a "takeoff."  (Tr. 225:5-7.)  Mr. Backman prepared such a list for the lumber portion of Hudson's Project.  (Ex. 16.)  As the parties' witnesses explained, the essential difference between a "materials list" transaction on the one hand, and a "turnkey" or "lump sum" transaction on the other hand, is with respect to who bears the risk

not say that Supply would be providing *all* materials required by the drawings, as might have been expected if a turnkey deal was intended. (Ex. 21.) The parties agree that the March 2020 letter of intent contemplated a turnkey deal (Tr. 15:7-9), and that letter tied the price to the Project's "plans and specifications" (Ex. 3), but that language is notably absent from the Supply LOI that Mr. Hooker sent after the February 8, 2022 meeting. (Ex. 21.) Second, the written proposal that immediately preceded the meeting was for the provision of a specific list of lumber and framing materials, not for all the materials the project might need (Ex. 16), and the documentary evidence therefore provides no reason to suppose that a "turnkey" or "lump sum" proposal was even on the table at the meeting. Third, the Supply witnesses testified confidently, univocally, and persuasively on this issue; each witness was clear that the company would not have proposed or accepted a "turnkey" or "lump sum" deal at the meeting because prices in the lumber market were simply too volatile at the time. (Tr. 27:7-11, 30:18-20, 105:24-106:5, 318:4-11.) Hudson's witnesses testified otherwise (*e.g.,* Tr. 220:23-224:1, 374:23-25), but the Court does not find that testimony credible considering the volume and persuasiveness of the contrary evidence.

The Court next finds, however, that Supply failed to prove an agreement on a price term. In particular, the Court finds that Supply failed to show that the parties agreed on a price of $6,911,000 *plus* a $150,000 hardware allowance. To be sure, Mr. Backman testified to such an agreement (Tr. 113:9-14), but the Court declines to credit this testimony because it is outweighed by several countervailing considerations. First, the Supply LOI says that the $6,911,000 contract price included hardware (*see* Ex. 21) (stating that the price was for the "Furnish of Framing

---

of materials overruns. In a "materials list" transaction, Hudson would be buying only the materials on the takeoff list, and if construction revealed that additional materials were needed, it would have to buy those separately. (Tr. 27:7-11.) Conversely, in a "turnkey" or "lump sum" transaction, Supply would be committing to provide all materials required by the drawings, even if that ended up being more than it had estimated. (Tr. 10:22-11:8.)

Material/Trusses/***Hardware***/Building Wrap" (emphasis added)), and Mr. Soares signed the letter on behalf of Supply even after Hudson's first draft of the contract alerted him to the fact that Hudson still thought that the "Subcontract Price" would "include . . . all allowances[.]" (Ex. D at Bates p. HM_00154.)  Second, Supply heavily marked up Hudson's proposed form of contract with dozens of changes in March of 2022, but it did not delete the proposed term that the "Contract Price include[d] an allowance of $150,000 for the furnish and delivery of all needed hardware[.]" (Ex. M at Bates p. HM_000260.)  Third, Mr. Soares did not endorse Mr. Backman's view with the level of confidence one might have expected from someone who attended the meeting.  (Tr. 35:20-36:2) (asserting that "if we needed $150,000 for hardware, it was there as an addition to the 6,911,000," but adding that that was only his "understanding" and deferring to Mr. Backman on the issue).  Fourth, Supply elicited no testimony supporting its interpretation of Mr. Hooker's 9:16 p.m. e-mail.  In that e-mail, Mr. Hooker wrote that the contract would ultimately "state there is a $150,000 allowance *included* for necessary hardware" (Ex. 20 at Bates p. 472) (emphasis added), and Supply somehow interprets this as saying that the $150,000 would be *on top of* the $6,911,000. But it adduced no such testimony from Mr. Hooker when it called him as a witness in its case-in-chief.  (Tr. 201:2-4; *see also* 228:8-14 (testifying on cross-examination to Hudson's "understanding that the total price of 6.911 million was inclusive of the two allowances").)  While each side ostensibly left the February 8, 2022 meeting thinking that an agreement had been reached on price, the Court finds that they were thinking different things—Hudson thought the parties had agreed upon $6,911,000 *including* an allowance for hardware, and Supply thought the parties had agreed upon $6,911,000 *plus* $150,000 for hardware.  In short, the parties' minds did not meet on the price term.

The Court also finds that the Supply LOI omitted several terms that were material to Hudson's willingness to enter a contractual relationship. First, Hudson's witnesses testified persuasively that a subcontractor's willingness to provide proof of financial strength was an essential term. (Tr. 222:8-10, 347:19-25.) Mr. Haass persuasively testified that the company requires financial statements from all its subcontractors, and he noted that all the subcontractors who ultimately participated in the Project ultimately provided them. (Tr. 348:4-8.) He added that Supply never provided financial information (Tr. 348:1-3), and no Supply witness contradicted him on that point; indeed, the Plaintiffs understood that Hudson would require this sort of "prequalification" process, because it had been required in the 2020 letter of intent. (Tr. 17:1-13.)[7] Second, Hudson's witnesses testified with equal persuasiveness that workers compensation insurance with an acceptable experience modification rating was an essential term for any subcontract. (Tr. 350:17-351:6.) Framers had had an above-average experience modification rating at the time of the 2019-2020 negotiations, and neither Plaintiff provided any updated workers compensation information in 2022. (Tr. 351:7-8.) Third, Hudson explained that it required liability insurance from all subcontractors, but neither Plaintiff ever provided a certificate of liability insurance. (Tr. 348:9-22.) Fourth, the post-February 8, 2022 discussions revealed that

---

[7]     In their post-trial brief, the Plaintiffs pointed out that the February 8, 2022 letters of intent did not contain the prequalification language used in their 2020 counterpart. (Pls.' Post-Trial Memo., ECF No. 124, at 20) ("Although Hudson had placed language about pre-qualification in the 2020 LOI, there was nothing in the February 8, [2022] LOIs concerning pre-qualification compliance as a condition precedent to being granted a contract."). But no Supply witness credibly testified to having any expectation of contracting with Hudson without completing prequalification. While Mr. Soares denied having been told "that if [he] didn't provide that information, that they would not let [him] go forward with the project" (Tr. 50:17-21), the Court finds that he did not need to be told. He later testified on cross-examination that the Plaintiffs' other customers have prequalification processes, and that completing them successfully is a requirement on "[j]ust about every project." (Tr. 81:24-82:6.)

the parties had not agreed on "retainage,"[8] and Mr. Hooker testified persuasively that this was also an essential term from Hudson's perspective. (Tr. 240:4-20.) Fifth, the parties disagreed on Hudson's right to withhold payment for defective materials, because Supply struck that provision out of the proposed contract. (Ex. M at Bates p. HM_000261; *see also* Tr. 243:13-14.) Sixth, the parties did not reach agreement on who would be responsible for discharging any mechanics' liens filed by third parties (*see* Ex. M. at Bates p. HM_000261) (reflecting that Supply crossed out proposed provision placing responsibility on itself), and Mr. Hooker credibly testified that Hudson would not have contracted without resolving that issue. (Tr. 243:22-244:3.) Seventh, the parties similarly lacked agreement on an indemnification provision (*see* Ex. M at Bates p. HM_000261) (reflecting that Supply crossed out a proposed provision requiring it to indemnify Hudson for liabilities that fell on Hudson because of Supply's performance), and Hudson submitted credible evidence that such a provision was essential. (Tr. 245:4-14.)

In summary, the Court finds that Supply and Hudson (1) agreed on a quantity term; (2) did not agree on a price term; and (3) did not agree on at least seven other terms that were material to Hudson's entry into a contractual relationship. The legal import of these findings will be discussed in Section III.C below.

---

[8]    "Retainage" is "[a] percentage of what a landowner pays a contractor, withheld until the construction has been satisfactorily completed and all mechanic's liens are released or have expired." *Retainage*, Black's Law Dictionary (12th ed. 2024). In the draft contract that it sent on March 16, 2022, Hudson proposed a term under which payment would be "subject to 10% retainage until final acceptance of all the Work." (Ex. L at Bates p. HM_000007.) In the markup version that it sent back on March 25, 2022, Supply struck this provision out and replaced it with "[n]o retainage on material." (Ex. M at Bates p. HM_000260.) Mr. Hooker persuasively explained that "the lender requires retainage on all contracts and materials," and that Hudson therefore "could not eliminate that requirement of holding retainage." (Tr. 240:10-13.) He added that retainage also "protect[s] against warranty or damaged product that's sent." (Tr. 240:13-14; *see also* Tr. 246:15-16 (agreeing that a "[n]o retainage" provision was a "deal breaker[]").)

### 3. *Events on and after February 8, 2022 pertaining to Supply's promissory estoppel claim*

Before and during the February 8, 2022 meeting, Supply informed Hudson that its price quotes were based on quotations from its own lumber supplier that were only good until the end of the day. (*See* Ex. 15; Tr. 36:11-14.) The parties left the meeting understanding that Supply would be locking in its pricing with its lumber supplier before close of business that day. (Tr. 29:12-14, 36:7-21, 170:18-22.) Supply's attendees then returned to their offices, and at 4:54 p.m., Mr. Soares sent a letter of intent to Sherwood. (Ex. 28.) In that letter, Supply confirmed its "commitment for material purchases at 201 Munson Street . . . pursuant to the emails sent from Kris Backman . . . to you at the rates agreed to from emails from your office." (*Id.*) The price that resulted from application of those rates was $3,239,037.41. (*Id.*; *see also* Tr. 324:3-6.) On February 23, 2022, Mr. Soares signed a Material Supply Contract with Reliable Truss and Components, Inc. for the engineered truss component of the Project. (Ex. 31.) After the Supply-Hudson relationship fell through in June of 2022, Reliable Truss did not force Supply to follow through on the deal, because Reliable had done an end run around Supply and contracted directly with Hudson. (Tr. 62:21-63:1, 118:9-15, 207:8-16.) But Sherwood did require Supply to follow through on its commitment, and Supply did in fact purchase all the lumber it had agreed to purchase. (Tr. 296:10-12, 297:21-23.) Supply could not resell that lumber at a profit, because industry prices had dropped in the meantime. (Tr. 63:6-15.)

The Court finds that Supply told Hudson at the February 8, 2022 meeting that it would be locking in its pricing with its supplier by the end of the day. Mr. Soares testified to "discussions with the Hudson Meridian side about the need to lock in [Supply's] pricing," and that he "made it crystal clear" that his quoted price was valid only through the end of the day. (Tr. 36:7-14) And while Mr. Calicchio initially tried to deny that Supply told him "they had to lock in their bid by

the end of the day," he withdrew that denial ignominiously when confronted with his deposition transcript on cross-examination. (*Compare* Tr. 375:3-5 (initially answering "no" when asked on direct examination if Supply had informed him of its need to lock in its price) *with* Tr. 394:16-20 (conceding on cross-examination that a price lock "was mentioned" at the meeting).)

The Court cannot, however, find by the preponderance of the evidence that Hudson *instructed* Supply to lock things in with its supplier. On this contested point, the evidence was in equipoise at best. On the one hand, Mr. Soares recalled Mr. Hooker as saying, "[g]o ahead and order the material." (Tr. 36:21, 38:21.) But on the other hand, Mr. Hooker flatly denied "tell[ing Supply] at that meeting to immediately lock in their lumber pricing." (Tr. 220:11-12.)[9] Moreover, the evidence did not establish that Hudson knew Supply would be making an *unbreakable* commitment to Sherwood. While Mr. Backman testified that Hudson knew "our commitment was not cancelable" (Tr. 116:19), the Court found the Hudson witnesses more credible on this point. The Hudson witnesses' surprise that Supply would make an irrevocable commitment to its supplier when so many terms remained unresolved with its customer impressed the Court as genuine. Mr. Hooker testified repeatedly and consistently that he "was not told that [the Supply-Sherwood deal] could not be rescinded" (Tr. 170:18-22), and he denied that anyone at Supply told him that "they . . . couldn't get out of it." (Tr. 219:23-220:1.)

---

[9]     In its post-trial brief, Supply cited two additional pieces of testimony in an effort to tip the scales on this point. (Pls.' Post-Trial Memo., at 6 ¶ 53) (claiming that "Hooker told Supply . . . that Supply should go ahead and commit [to] its suppliers by close of business that day"). But neither citation supports its position. At p. 116, Mr. Backman testified that Hudson "knew that [Supply] had to give our commitment to Sherwood," but he did not testify that Hudson instructed him to do so. (Tr. 116:17-22.) And at pp. 170-71, Mr. Hooker confirmed his understanding that Supply "needed the letter of intent to lock in the price," but he did not confirm having instructed Supply to do so, nor having promised Supply that Hudson would follow through with the deal if it committed to Sherwood. (Tr. 170-71.)

To summarize, the credible evidence established that (1) Supply told Hudson it would be locking in its pricing with Sherwood by the end of the business day on February 8, 2022; (2) Hudson did nothing to stop Supply from making that commitment; and (3) Hudson did not then understand that Supply's commitment would be irrevocable.  In Section III.D below, the Court will address whether these facts add up to a valid claim for promissory estoppel.

### 4.    Events on and after February 8, 2022 pertaining to Framers' contract breach claim

The parties also discussed the labor portion of the Project at the February 8, 2022 meeting. (Tr. 36:4-6.)  They agreed on a price of $3,230,000.  (Tr. 36:6, 180:25-181:6; Ex. 22.)  Mr. Hooker then prepared a letter of intent, "confirm[ing Hudson's] intent to enter into a contract with [Framers] for the Labor for Framing Material/Trusses/Hardware/Building Wrap at the [Project] for the Contract Price of Three Million, Two Hundred, Thirty Thousand Dollars and Zero Cents ($3,230,000.00 USD)."  (Ex. 22)  The letter of intent was signed by Mr. Hooker, and it added that Framers' countersignature would constitute an acceptance of the "Contract Price."  (*Id.*)  It went on to say that a "final Trade Contract" would be "forwarded . . . shortly," and that the letter could "be rescinded by Hudson Meridian at any time, subject to the terms of the Trade Contract."  (*Id.*) The letter closed by saying that Hudson "look[ed] forward to [Framers'] services on the project and the final execution of the Trade Contract."  (*Id.*)  Mr. Soares signed and returned the letter of intent on behalf of Framers on February 11, 2022.  (Exs. 24, F) ("Framers LOI").

On February 10, 2022, Hudson sent Framers a proposed contract for the labor portion of the job.  (Ex. E.)  In contrast to the proposed contract on the materials portion, Framers did not mark up or otherwise specifically comment upon this proposed labor contract.[10]  (Tr. 81:19-21,

---

[10]      Although it was intended to apply only to the materials portion of the job, the draft contract that Hudson contemporaneously sent to *Supply* did include many provisions addressing labor

256:13-15.)  By June of 2022, Framers had neither signed Hudson's proposed labor contract nor provided a proposal of its own.  (Tr. 81:17-18, 256:10-12.)

On June 15, 2022, Hudson sent Framers a letter "rescinding and terminating" the letter of intent.  (Ex. 36.)  The rescission letter noted that Framers had "failed to timely complete the pre-qualification forms that were supplied," and it stated that completion of the prequalification process was "a condition precedent for [Framers'] being retained as a subcontractor or vendor at the Project."  (*Id.*)  The letter added that "we have been unable to agree upon various important terms of our written agreement," and that the companies had "significant differences re the current price of work [Framers] will be providing to Hudson Meridian, etc."  (*Id.*)

On August 29, 2022, Hudson executed a contract with Unlimited Carpentry of Sandy Hook, Connecticut for the framing labor portion of the Project.  (Ex. 39 & Bates p. HM_000865.) Before executing the contract, Unlimited Carpentry completed Hudson's prequalification process. (*See* Tr. 354:2-12) (testimony from Mr. Haass that Hudson would not "move forward" with any contract unless counterparty had completed prequalification).  Unlimited Carpentry also agreed to Hudson's proposed terms respecting insurance, indemnification, and satisfaction of mechanics' liens.  (Ex. 39 at Bates pp. HM_000858-59.)

The Court finds that, although Framers and Hudson agreed on a price, they did not both intend to be bound merely upon agreeing on that term.  Here, as with Supply, the terms that were missing from the letter of intent were material to Hudson's willingness to enter a contractual relationship.  That willingness was contingent upon Hudson's satisfaction with Framers' financial condition, but Framers never provided proof of that.  (Tr. 347:16-348:8.)  It was also contingent

---

arrangements.  (*See generally* Ex. D.)  Supply did comment upon those in its markup.  (*See generally* Ex. M.)

upon proof of adequate liability insurance, but Framers never provided that either.  (Tr. 348:9-22.)
Hudson's willingness also depended on Framers' acceptance of a satisfactory indemnification
provision (Tr. 245:7-8), and Framers never accepted that.  Finally, Hudson's willingness also
hinged on proof that Framers maintained workers compensation insurance with an acceptable
experience modification rating, which Framers never provided.  (Tr. 350:17-353:25.)  The legal
implications of these findings will be addressed in Section III.E below.

## III.    CONCLUSIONS OF LAW

### A.    Subject Matter Jurisdiction

The Plaintiffs invoked the Court's diversity jurisdiction.  (Am. Compl., ECF No. 70 ¶ 6.)
Diversity jurisdiction exists when the parties are "citizens of different States" and the "matter in
controversy" exceeds "the sum or value of $75,000, exclusive of interest and costs[.]"  28 U.S.C.
§ 1332(a).  For diversity jurisdiction purposes, a limited liability company "takes the citizenship
of each of its members."  *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*,
692 F.3d 42, 49 (2d Cir. 2012).  "When one of the members is itself an LLC, the first LLC's
citizenship is determined by the citizenship of the members of the second."  *Int'l Supply II*, 2025
WL 1726365, at *5 (citing *Avant Cap. Partners, LLC v. W108 Devel. LLC*, 387 F. Supp. 3d 320,
322 (S.D.N.Y. 2016)).  "Once the natural persons who make up the direct or indirect membership
of the LLC have been identified, their citizenship is determined by their domicile."  *Id.* (citing
*Universal Reins. Co., Ltd. v. St. Paul Fire & Marine Ins. Co.*, 224 F.3d 139, 141 (2d Cir. 2000)).
In this case, all three parties are LLCs.  Having found that each of the Plaintiff LLCs has a
Connecticut citizen, Anthony Gallagher, as its sole member; and having found that the natural
person whose citizenship determines Hudson's citizenship for jurisdictional purposes is William
Cote, a New Jersey citizen; and having further found that the amount in controversy is

$1,778,000.00; the Court concludes that it has subject matter jurisdiction over the case pursuant to

28 U.S.C. § 1332.

B.    **Choice of Law**

In deciding what body of law to apply to disputes under its diversity jurisdiction, this Court

follows Connecticut choice-of-law rules.  "[A]s a general matter, a federal district court sitting in

diversity jurisdiction must apply the substantive law of the state in which it sits."  *Pappas v. Philip*

*Morris, Inc.*, 915 F.3d 889, 893 (2d Cir. 2019) (emphasis omitted).  "This rule applies as well to

the laws and rules governing the choice of law to apply when that choice is uncertain."  *U.S. Fid.*

*& Guar. Co. v. S.B. Phillips Co*., 359 F. Supp. 2d 189, 204-05 (D. Conn. 2005) (citing *Klaxon Co.*

*v. Stentor Elec. Mfg. Co*., 313 U.S. 487 (1941)).

In contract cases such as this one, Connecticut follows the "most significant relationship"

approach from the Restatement (Second) of Conflict of Laws.  *Reichhold Chems., Inc. v. Hartford*

*Acc. & Indem. Co.*, 252 Conn. 774, 781 (2000).  Under the Restatement, absent a contractual choice

of law provision, courts look to several factors to determine the most significant relationship: "(a)

the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance,

(d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality,

place of incorporation and place of business of the parties."  Restatement (Second) of Conflict of

Laws § 188 (1971).  In this case, some of these factors might arguably have suggested the

application of New York law.  The fateful February 8, 2022 meeting took place at Hudson's place

of business in White Plains (Tr. 32:23-24), and Mr. Hooker appears to have signed the two LOIs

there.  (*See* Exs. 21, 22.)

The Court will nonetheless apply Connecticut law, for two reasons.  First, other

Restatement factors support the application of Connecticut law; the place of performance and the

subject matter of the alleged contracts, for example, are both in New Haven.  (*See id.*) (stating the "Project Name" as "201 Munson Street – New Haven, CT").  Second and even more importantly, the parties evidently agree that Connecticut law applies.  Both sides cited Connecticut cases and statutes almost exclusively in their post-trial briefs (ECF Nos. 123, 124), and neither side objected when the Court applied Connecticut law at the motion to dismiss and summary judgment stages. *Int'l Supply I*, 2024 WL 707014, at *2; *Int'l Supply II*, 2025 WL 1726365, at *6.  "[W]here the parties have agreed to the application of forum law, their consent concludes the choice of law inquiry."  *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 743 (2d Cir. 1999) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)).  Because the parties agree on this point, the Court will apply Connecticut law.[11]

### C.      Count One:  Contract Breach as to Supply

In Count One of its Amended Complaint, Supply asserted that Hudson repudiated—and thereby breached—an enforceable agreement to purchase construction materials.  (Am. Compl., ECF No. 70, Count One.)  Because Supply alleged a transaction in goods, the questions of contract formation and breach raised by Count One are governed by Article 2 of the Uniform Commercial Code.  *See* Conn. Gen. Stat. § 42a-2-102 ("[T]his article applies to transactions in goods[.]").  Article 2 defines "goods" as "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities covered by article 8 and things in action."  Conn. Gen.

---

[11]      As the Court will explain in the next section, the contract breach claim asserted by Supply in Count One of the Amended Complaint is subject to the Uniform Commercial Code.  Because the code is essentially the same from state to state, Connecticut courts often cite out-of-state authorities in interpreting it.  *E.g., Jacobs v. Healey Ford-Subaru, Inc.*, 231 Conn. 707, 719-20 (1995) (citing Delaware authorities); *Seven Oaks Enters., L.P. v. Devito*, 185 Conn. App. 534, 548-50 (2018) (citing authorities from multiple jurisdictions).  In ruling on Count One, this Court will likewise cite authorities from states other than Connecticut.

Stat. § 42a-2-105(1).  The alleged contract between Supply and Hudson involves lumber, manufactured roofing trusses, and hardware (*see* Exs. 16, 18), all of which are "goods" in the contemplation of Article 2.  *See, e.g., Page v. Sagebrush Sales Co.*, 114 Ariz. 271, 272-73 (1977) (applying Article 2 to "a sale of lumber"); *Murphy v. Speltz-Schultz Lumber Co. of Grand Island*, 240 Neb. 275, 283-84 (1992) (observing that "roof trusses . . . are clearly 'goods' as defined by Neb. U.C.C. § 2-105(1)," and holding that Article 2 applied even though the seller had also provided design services); *Hudson v. Town & Country True Value Hardware, Inc.*, 666 S.W.2d 51, 52 (Tenn. 1984) (considering a contract to sell a hardware store's realty and stock, and concluding that the hardware stock would constitute "'goods' as defined in the U.C.C.").

Contract formation can be less formal under the U.C.C. than under the common law.  Under Article 2, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  Conn. Gen. Stat. § 42a-2-204(1); *see also N. Jonas & Co., Inc. v. Brothers Pool Enters, Inc.*, 638 F. Supp. 3d 193, 200 (D. Conn. 2022) (same).  Moreover, parties can form a contract for the sale of goods "[e]ven though one or more terms are left open[.]"  Conn. Gen. Stat. § 42a-2-204(3).  The U.C.C. "is more flexible" than the common law in this respect, because when terms are omitted, the Code's gap-filing provisions can often supply them.[12]  *Ultimate Nutrition, Inc. v. Leprino Foods Co.*, 779

---

[12]    In its post-trial brief, Hudson cited *Squillante v. Capital Region Development Authority*, 208 Conn. App. 676, 688 (2021) for the proposition that "[a] contract is not made so long as, in the contemplation of the parties, something remains to be done[.]"  (Def.'s Post-Tr. Br., ECF No. 123, at 9.)  The Court interprets this citation as an argument that parties must agree on all terms—immaterial as material—before their transaction can be regarded as an enforceable contract.  Such an argument would be mistaken even under the common law, let alone the U.C.C.  *See Willow Funding Co. v. Grencom Assocs.*, 63 Conn. App. 832, 845 (2001); *see also* discussion, Section III.E *infra*.  In any event, *Squillante* was not a sale-of-goods case governed by the U.C.C.  208 Conn. App. at 678 (stating that the transaction at issue involved "financing for the renovation of residential apartment units").

F. Supp. 3d 203, 214 (D. Conn. 2025) (quoting *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 494 (S.D.N.Y. 2022)).  Indeed, parties may even "conclude a contract for sale" without a specific, numerical price term, "because the court may supply 'a reasonable price at the time for delivery.'" *Id.* (quoting Conn. Gen. Stat. § 42a-2-305(1)); *see also Taylor v. Hoffman Ford, Inc.*, No. CV-04-4000390, 2005 WL 2503722, at *4 (Conn. Super. Ct. Sept. 22, 2005) (quoting Conn. Gen. Stat. § 42a-2-305(1) for the proposition that "[t]he parties if they so intend can conclude a contract for sale even though the price is not settled").

This relaxed approach does not, however, permit courts to imply a binding agreement when the parties did not intend to be bound.  While the U.C.C. is "particularly forgiving of indefinite terms," that forgiveness comes into play only after it is demonstrated "that the parties intended to contract." *AFP Imaging Corp. v. Philips Medezin Systeme Unternehmensbereich Der Philips GmbH*, No. 92-Civ.-6211 (LMM), 1994 WL 652510, at *5 (S.D.N.Y. Nov. 17, 1994).  Put differently, "if there be no basic agreement, the [U.C.C.] will not imply one." *Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972, 973 (1977); *see also Taylor*, 2005 WL 2503722, at *4 (noting that, although Article 2 permits courts to supply a missing price term, "[w]here . . . the parties intend not to be bound unless the price is fixed or agreed and it is not fixed or agreed there is no contract").

In distinguishing unenforceable preliminary understandings from enforceable contracts with missing terms, courts focus on objective considerations.  As Judge Pooler once put it, "[i]n determining whether the parties entered into a contractual agreement and what its terms were, the court must look to the objective manifestations of intent of the parties to be bound rather than to their subjective intent." *Wallace Indus., Inc. v. Cont'l Coal Sales Corp.*, No. CIV-A-96-CV-785 (RSP) (DS), 1998 WL 166842, at *4 (N.D.N.Y. Apr. 7, 1998) (citing *Brown Bros. Elec.*

*Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977)).  "In doing so, disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain[.]"  *Brown Bros.*, 41 N.Y.2d at 399-400 (citations omitted); *accord Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005) ("The totality of the parties' acts, phrases and expressions must be considered[.]").

One key consideration in differentiating unenforceable preliminary understandings from enforceable contracts is the degree to which the parties contemplated additional writings.  As Judge Broderick has explained, "[w]here a writing sent by the party to be bound to the other specifically indicates that an additional agreed-upon writing is contemplated prior to entry into a binding contract, this indication of intent should be honored."  *Durable, Inc. v. Twin Cnty. Grocers Corp.*, 839 F. Supp. 257, 260 (S.D.N.Y. 1993) (citing, *inter alia*, *Arcadian Phosphates v. Arcadian Corp.*, 884 F.2d 69, 72-73 (2d Cir. 1989)).  "Otherwise . . . the result would be that of 'trapping parties in surprise contractual obligations that they never intended.'"  *Id.* (quoting *TIAA v. Tribune Co.*, 670 F. Supp. 491, 497 (S.D.N.Y. 1987)).

Another key consideration is the number and materiality of missing terms.  To be sure, a contract can form under the U.C.C. even if some important terms are omitted, as noted above.  But as the official commentary to Section 2-204 explains, "[t]he more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement[.]"  Conn. Gen. Stat. § 42a-2-204 cmt. 1; *see also Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 747 (2d Cir. 1998) (same); *Am. Iron & Metal Co., Inc. v. U.S. Ferrous Trading Div., Tube City Div., Tube City IMS*, No. 3:06-cv-1538 (PCD), 2007 WL 1125682, at *6 (D. Conn. Apr. 16, 2007) (same).

A recent case from the District of Massachusetts shows this principle in action.  In *APB Realty, Inc. v. Lebanon and Blue Mountain Railway, LLC*, two parties discussed the sale of some rail cars.  No. 21-11347 (MPW), 2024 WL 4135086, at *1 (D. Mass. Sept. 9, 2024).  They agreed on price and quantity, the seller sent an invoice, and the buyer wired a deposit.  *Id.* at *3.  When the buyer backed out and the seller sued, the court was called upon to consider whether the parties had intended to be bound.  The court noted that "[t]he invoice did not . . . include several provisions that would be material to any contract for the sale of 100 [rail cars], such as provisions related to . . . title and risk of loss, removal and remarking of rail cars, maintenance of liability insurance, indemnification, limitation and warranties, taxes, maintenance, and transportation."  *Id*.  (quotation marks omitted).  It acknowledged that, under the U.C.C., "a contract does not fail for indefiniteness solely because material terms are left open[.]"  *Id*. at *4 (citing Mass. Gen. L. ch. 106 § 2-204(1)).  Nevertheless, "the large number of material terms left unspecified by the invoice . . . indicate[d] that the parties did not intend to create a binding contract[.]"  *Id*.

Other cases make the same point.  For example, in *CG Schmidt Inc. v. Permasteelisa North America* the court held that the parties did not have an enforceable contract, even though the buyer responded to the seller's bid with a letter of intent, in part because the number and importance of the "missing and/or incomplete bid terms" made it "unlikely that [the seller's] proposal would have reasonably led [the buyer] to conclude that its assent to the bid would 'conclude' their bargain."  142 F. Supp. 3d 763, 771 (E.D. Wis. 2015).  To cite another example, in *AFP Imaging* the court held that the parties did not have a binding agreement with respect to an expensive mammography machine, in part because the record showed that the parties had not reached agreement on warranty and financing terms that were material to the deal.  1994 WL 652510, at *6.  And in *American Iron* the court observed that, while the U.C.C. expressly contemplates that

parties will sometimes omit even a price term, "it is also true that a failure to finalize a price term may ultimately evince a lack of intent to be bound."  2007 WL 1125682, at *6.  These and other cases stand for the proposition that, while Article 2 holds parties to genuine agreements even when they omit key terms, and while it authorizes courts to fill gaps when the parties have indeed reached an agreement, it also authorizes courts to consider the number and materiality of the missing terms in deciding whether the parties in fact agreed.

Applying these principles to the facts found in Section II above, the Court holds that Supply did not meet its burden to prove the formation of an enforceable agreement with Hudson or a breach thereof.  Focusing on objective manifestations of intent rather than subjective intentions, as the above-cited authorities require, the Court begins with the language of the Supply LOI itself. That document confirmed Hudson's "intent to enter into a Contract," which suggests an intention to contract in the future rather than to be presently bound.  (Ex. 25.)  Additionally, the Supply LOI expressly contemplated an additional writing when it said that it would be followed by a "final Trade Contract[.]"  (*Id.*)  Moreover, the simple fact that the document is a letter of intent—as opposed to a purchase order or some other sale document—likewise suggests that Hudson did not intend to be bound until the final trade contract was completed.  The term "letter of intent" "[g]enerally . . . refers to a writing documenting the preliminary understandings of parties who intend in the future to enter into a contract," and its "purpose and function" is "not to bind the parties to their ultimate contractual objective[,]" but rather "to provide the initial framework from which the parties might later negotiate a final agreement, if the deal works out[.]"  *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 76 n.33 (2005) (ellipses omitted) (quoting *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir.), *cert. denied*, 519 U.S. 865 (1996)).  To be sure, the Court held at the motion to dismiss and summary judgment stages that these factors did not negate the existence

of an enforceable agreement as a matter of law. *Int'l Supply I*, 2024 WL 707014, at *4; *Int'l Supply II*, 2025 WL 1726365, at *7-8. But they are strongly indicative of a lack of present intention to be bound, and the other trial evidence supported rather than undermined that conclusion.

In particular, the lack of a meeting of the minds on a price term supports the conclusion that the parties did not reach an enforceable agreement. Of course, parties can create enforceable agreements without settling on a price, if they so intend. *E.g. Ultimate Nutrition*, 779 F. Supp. 3d at 214 ("Under the UCC, 'parties can conclude a contract for sale even though the price is not settled[.]'" (quoting Conn. Gen. Stat. § 42a-2-305(1))). Under the U.C.C., the only strictly required term is the quantity term, *id.* (citing *Bazak Int'l Corp.*, 378 F. Supp. 2d at 386), and here, the parties did settle on a quantity. (*See* discussion, Section II.C.2 *supra*.) But this is clearly not a case in which the parties intended to be bound upon agreeing on a quantity, leaving the price to be determined later by operation of a default rule. Rather, it is a case in which reaching a specific price was material to both sides, but they failed to do so when their minds failed to meet on the issue of the hardware allowance.

Finally, the Court also bases its holding on the number and materiality of the terms that were omitted from the Supply LOI. As noted above, contracts can form under the U.C.C. even if some terms are omitted, but "[t]he more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement." Conn. Gen. Stat. § 42a-2-204 cmt. 1. In this case, the Supply LOI omitted any discussion of at least seven terms that were material to Hudson's willingness to enter a contract. (*See* discussion, Section II.C.2 *supra*.) Critically important issues of prequalification, liability insurance, workers compensation insurance, retainage, payment responsibility for defective materials, responsibility for the discharge of mechanics' liens, and indemnification in the event of third-party claims were all left for future negotiations. (*See id.*)

Here, as in *C.G. Schmidt,* the number and essentiality of the missing terms made it objectively unreasonable for Supply to conclude that Hudson intended to be irrevocably bound by the LOI. 142 F. Supp. 3d at 771 ("Based on these missing and/or incomplete bid terms, the Court finds it unlikely that PNA's proposal would have reasonably led CGS to conclude that its assent to the bid would 'conclude' their bargain.").

In summary, (1) the language of the Supply LOI suggests a present intention not to be bound; (2) the choice of a letter of intent (as opposed to some other type of sale document) suggests the same intention, *Glazer*, 274 Conn. at 76 n.33; (3) the Supply LOI contemplated "an additional agreed-upon writing . . . prior to entry into a binding contract," which is an "indication of intent" that "should be honored," *Durable, Inc.*, 839 F. Supp. at 260; (4) the parties' minds did not meet on a price term, and this was plainly not an instance in which they intended to be bound without an agreement as to price; and (5) the Supply LOI failed to address at least seven terms that were essential from Hudson's perspective.  For these reasons, the Court will rule for Hudson on Count One.

### D.    Count Two:  Promissory Estoppel as to Supply

In Count Two of the Plaintiffs' Amended Complaint, Supply alleged that Hudson is liable under a theory of promissory estoppel.  (Am. Compl., ECF No. 70, Count Two.)  Specifically, Supply asserted that Hudson "promised to purchase materials . . . for the Project[,]" and that it "changed its position in justifiable reliance on Hudson's . . . promise."  (*Id.* ¶¶ 40-41.)  It added that Hudson "should reasonably have expected . . . Supply to change its position[,]" and that "[i]njustice can be avoided only by enforcement of Hudson's . . . promise to pay for the materials." (*Id.* ¶¶ 42-43.)

To prevail under a theory of promissory estoppel, a plaintiff must prove three essential elements. First, it must show that the promiser "failed to honor a clear and definite promise[.]" *Kent Literary Club of Wesleyan Univ. at Middletown v. Wesleyan Univ.*, 338 Conn. 189, 209 (2021). Second, it must establish that the promise was one that the promisor "reasonably should expect to induce detrimental action or forbearance on the part of the promisee[.]" *Id.* Third, the plaintiff must show that the promise did, in fact, "induce detrimental action or forbearance in reasonable reliance on the promise." *Id.* In addition, the court "must find, as a matter of law, that injustice can be avoided only by enforcement of the promise." *Id.*; *see also D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.*, 202 Conn. 206, 213 (1987) ("[A] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." (quoting Restatement (Second) of Contracts § 90 (1981))). The plaintiff must establish all three elements by a preponderance of the evidence. *Factor King, LLC v. Secondino & Son, Inc.*, No. NNH-CV-15-6055989-S, 2018 WL 2423601, at *5 (Conn. Super. Ct. May 9, 2018).

The first element is established when the promisor makes a promise that is sufficiently definite to manifest a present intention to be bound, and then reneges on that promise. The promise does not need to be so finely detailed as to "be the equivalent of an offer to enter into a contract[,]" because the basis for a promissory estoppel claim "'is a *promise* and not a bargain and *not* an *offer.*'" *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 105 (2003) (emphasis in original) (quoting A. Corbin, Contracts (Rev. Ed. 1996) § 8.9, p. 29). But the promise needs to be clear and definite enough to "reflect a present intent to commit as distinguished from a mere statement of intent to contract in the future." *Id.* This determination depends on "the circumstances under

which the representation was made[,]" *id.* at 106, but the "determinative factors in deciding whether a statement is a promise" are "[c]larity and definiteness, as opposed to expressions of intention, hope, desire, or opinion[.]" *Jarnutowski v. Pratt & Whitney*, 103 F. Supp. 3d 225, 241 (D. Conn. 2015).

In determining whether a promise has sufficient clarity and definition to suggest a present intention to be bound, courts may analyze the promise in relation to the material terms of the contemplated transaction. Again, the promise need not be so detailed as to constitute a formal offer to contract, and it need not contain all the material terms of the deal as a matter of law. *Stewart*, 267 Conn. at 105. But if, "[a]t the time th[e] alleged promise was made, material terms remained unresolved," that fact can support a finding that the promise was "too vague to satisfy the requirement of a 'clear and unambiguous promise' on the part of the promisee." *UpTempo Sports, LLC v. Benefit Coatings, Inc.*, 731 F. Supp. 3d 350, 357-58 (D. Conn. 2024) (citations omitted); *cf. also R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 78-78 (2d Cir. 1984) (affirming District Court's grant of summary judgment on an oral promissory estoppel claim under New York law, where the record evidence showed that the signing of a written contract was material to the alleged promisor).

This point may be illustrated by contrasting two Connecticut Supreme Court cases, *D'Ulisse-Cupo* and *Stewart*. In *D'Ulisse-Cupo* a school declined to re-hire a teacher even after it allegedly "represent[ed] that she would receive a new employment contract." 202 Conn. at 206. The Connecticut Supreme Court concluded that the representations were not "sufficiently promissory nor sufficiently definite to support contractual liability[,]" in part because "none of the representations contained any of the material terms that would be essential to an employment contract, such as terms regarding the duration and conditions of the plaintiff's employment, and

her salary and fringe benefits." *Id*. at 214-15. Under those circumstances, the officials'
representations were properly viewed as communicating an unenforceable "expectation of a future
contract" rather than "a definite promise of employment on which [the plaintiff] could reasonably
have relied." *Id.* at 215. In *Stewart*, by contrast, an employer promised an employee that it would
not hold it against her if her husband went to work for a competitor; the employee relied on the
promise by staying with the company and forgoing other job opportunities, but the company fired
her anyway. 267 Conn. at 99-100. The Connecticut Supreme Court affirmed a finding of liability
in promissory estoppel because the employer's representations "were far more limited in scope
than the representations at issue in *D'Ulisse-Cupo*." *Id.* at 109. In the case of broad representations
like those allegedly made in *D'Ulisse-Cupo*, the absence of key terms supported a conclusion that
those representations "were insufficiently promissory and definite to be actionable." *Id.* at 108.
But the issue of whether the employer's representations in *Stewart* "were sufficiently clear and
definite to constitute a promise upon which the plaintiff reasonably could have relied [was]
significantly narrower than the issue that was presented in *D'Ulisse-Cupo*, namely, whether the
representations of the representatives of the school board constituted a promise of an entirely new
employment contract even when those representations did not contain terms and conditions that
necessarily comprise any such contractual arrangement." *Id.* at 109.

The second element of a promissory estoppel claim is established when the plaintiff shows
that the promise was one "which a promisor could reasonably have expected to induce reliance."
*D'Ulisse-Cupo*, 202 Conn. at 213. This element "assesses reasonableness from the perspective of
the promisor." *Omega Eng'g, Inc. v. Eastman Kodak Co.*, 908 F. Supp. 1084, 1097 n.13 (D. Conn.
1995). The reasoning behind this approach is that a promisor should not be "liable to a promisee
who has relied on a promise if, judged by an objective standard, he had no reason to expect any

reliance at all." *D'Ulisse-Cupo*, 202 Conn. at 213. Like the first element, this second element looks to the circumstances under which the representation was made. *See, e.g., T & M Bldg. Co., Inc. v. Hastings*, No. HHD-CV-13-6039637, 2015 WL 6499658, at *5 (Conn. Super. Ct. Oct. 5, 2015) (Elgo, J.), *aff'd* 194 Conn. App. 532 (2019). These circumstances may include the history of negotiation between the parties, the relationship between them, and the existence and content of other representations made by the alleged promisor. *See id.* (examining promissory estoppel claim in the context of where the parties were in their negotiations, and considering other statements made by the defendant). In *Stein v. Gelfand,* for example, a New York federal court held that the plaintiff's reliance on an alleged oral promise "would have been manifestly unreasonable," since the alleged promise was made in a "brief conversation . . . that . . . left for future resolution so many key terms." 476 F. Supp. 2d 427, 436 (S.D.N.Y. 2007).

To prove the third element, the plaintiff must show that the promise induced detrimental reliance. "[R]eliance may take the form of action or forbearance[,]" *Jarnutowski*, 103 F. Supp. 3d at 241, but in either case, it "must amount to a detrimental change of position." *Stewart*, 267 Conn. at 113 (quoting A. Corbin, Contracts (Rev. Ed. 1996) § 8.9, p. 30). Just because a change of position occurs after a promise does not necessarily mean that it was induced by that promise. In *T & M Building Co.*, for example, a real estate developer received a handwritten document from a property owner, discussing a $943,000 sale price with a "[r]ight to [b]ack out." 194 Conn. App. at 534-35. The developer then spent over $250,000 on engineering services for the property. *Id.* at 554. When the transaction failed, he contended that his expenses had been induced by the promises made in the handwritten document. *Id.* But after a full evidentiary hearing, Judge Elgo concluded that the evidence did not support a claim of induced detrimental reliance. 2015 WL 6499658, at *5. Rather, the evidence supported the view that the developer "chose to take the risk

of investing in [the engineering] services and other expenses *after*" the property owner clearly communicated that the deal might not go through due to other disagreements. *Id.* (emphasis in original). Under those circumstances, the developer had not "spent that money . . . in reliance on a clear and definite promise that the [property owner] could reasonably have expected to induce reliance[.]" 194 Conn. App. at 555.

In addition to the three required elements, a court must also "find, as a matter of law, that injustice can be avoided only by enforcement of the promise" before it can rule for the plaintiff on a promissory estoppel claim. *Kent Literary Club*, 338 Conn. at 209. The Connecticut appellate courts have yet to discuss this additional requirement in detail, but other courts have. These authorities generally hold that, before a court can find that justice commands enforcement of a promise made without consideration, it should analyze (among other things) whether reliance was reasonable from the *promisee's* standpoint. In other words, whereas the second of the three required elements "assesses reasonableness from the perspective of the promisor," *Omega Eng'g*, 908 F. Supp. at 1097 n.13, if the court gets past the three elements and reaches the injustice inquiry, it should also consider whether the promisee's reliance was reasonable from its own perspective.

For example, the commentary to Section 90 of the Restatement (Second) of Contracts— which the Connecticut Supreme Court cited with approval in *Stewart*, 267 Conn. at 100—explains that the "injustice" inquiry may hinge on several factors, including "the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant." Restatement (Second) of Contracts § 90, comment b. In *Thatcher's*

*Drug Store v. Consolidated Supermarkets*, the Pennsylvania Supreme Court applied these Restatement factors in concluding that a promisor was not liable in promissory estoppel; "[the promisee's] reliance was unreasonable" from his own perspective because "nothing was done to formalize" the alleged oral promise on which he claimed to rely.  535 Pa. 469, 477-479 (1994).  And in *Hawkins Construction Co. v. Reiman Corp.*, the Nebraska Supreme Court held that a promisee's alleged reliance was unreasonable because it "relied on [the promisor's] expected acquiescence to certain nonstandard additional [contract] conditions which could be considered onerous."  245 Neb. 131, 136 (1994).  "It was unreasonable for [the promisee] to expect that [the promisor] would have to agree to the many nonstandard provisions contained in" its proposed contract.  *Id.*

In summary, to prevail on the promissory estoppel claim in Count Two, Supply had to prove by the preponderance of the evidence that (1) Hudson made and then reneged upon a promise that was sufficiently clear and definite to manifest a present intention to be bound, (2) Hudson reasonably should have expected that promise to induce reliance on the part of Supply, and (3) Supply did in fact rely on the promise by changing its position to its detriment.  And if Supply proved these three things, the Court would also have to conclude as a matter of law that injustice could be avoided only by enforcement of the promise.

Supply's promissory estoppel claim fails on the first element, because it failed to prove that Hudson made and reneged on a clear and definite promise.  As discussed in Section II.C above, the evidence proved only that Hudson left the February 8, 2022 meeting knowing that Supply would be locking in its pricing with Sherwood.  It did not prove that Hudson instructed Supply to do so, let alone that Hudson irrevocably promised to buy Supply's lumber merely upon agreeing on a quantity term.

In reaching this conclusion, the Court has considered that many essential terms of the contemplated transaction were left unresolved after the February 8, 2022 meeting, even in Supply's own telling.  While Supply and Hudson did agree on a quantity term when they settled on a "materials list" rather than a "turnkey" proposal, and while each side may have erroneously thought it had agreed on a price (*see* discussion, Section III.C *supra*), the parties agreed on virtually nothing else.  Essential terms concerning financial prequalification, insurance protection, retainage, defective materials, mechanics' liens, and indemnification were all unaddressed at the meeting, even according to Supply's own witnesses.  In this case, as in *UpTempo Sports*, the fact that "material terms remained unresolved" at the time of the alleged promise supports a finding that it was "too vague to satisfy the requirement of a clear and unambiguous promise on the part of the promisee."  *UpTempo Sports*, 731 F. Supp. 3d at 357-58 (citation and quotation marks omitted).

This point also demonstrates why Supply's claim fails on the second element—that is, a reasonable expectation of reliance on Hudson's part.  In addressing this element, it is important to note that Supply's promissory estoppel claim is based solely on Hudson's alleged oral representations at the February 8, 2022 meeting; it could not be based on the written statements in or following the Supply LOI, because Supply had already committed to Sherwood before it ever saw those statements.  (*Compare* Ex. A (establishing that Supply sent its letter of intent to Sherwood at 4:54 p.m. on February 8, 2022) *with* Ex. C (establishing that Hudson did not send the Supply LOI to Supply until 5:08 p.m. that day).)  Taking this fact together with the other facts it has found, to find for Supply on the second element, the Court would have to conclude that Hudson reasonably should have expected reliance from an oral conversation that omitted many material terms.  But Supply cites no authority for that proposition (*see* Pls.' Post-Trial Memo., ECF No.

124, at 17), and indeed the authorities are to the contrary. *See, e.g., Stein*, 476 F. Supp. 2d at 436 (granting summary judgment to defendant on plaintiff's promissory estoppel claim, in part because the plaintiff "could not reasonably have relied upon" a "brief conversation" that "left for future resolution so many key terms").

Finally, even if Supply had satisfied its burden on all three required elements, the Court could not find that "injustice can be avoided only by enforcement of the promise." As noted above, consideration of this issue involves assessing the reasonableness of reliance from Supply's perspective. And it is unreasonable for a party to rely on another's promise when many essential terms remain unresolved, and when the party is seemingly depending on the promisor's future acquiescence on contested points. *See Hawkins Constr. Co.*, 245 Neb. at 136 (finding that it was unreasonable for a promise to rely "on [the promisor's] expected acquiescence to certain nonstandard additional [contract] conditions"). In this case, even if Hudson had said "we'll buy your lumber for $6,911,000 plus a $150,000 hardware allowance" on February 8, 2022, Supply knew from the 2020 discussions that many important issues remained to be negotiated, and that Hudson's proposals on those issues would differ from Supply's in key respects. (*Compare* Ex. 1 (Framers' 2020 bid with proposed contract terms) *with* Ex. 4 (Hudson's 2020 contract proposal, containing different terms).) In summary, the evidence failed to support the claim that Hudson made a clear and definite promise upon which Supply reasonably relied, or upon which Hudson could have reasonably expected it to rely.

### E.  Count Three:  Breach of Contract as to Framers

In Count Three, Framers asserted that Hudson repudiated and breached an enforceable agreement "to provide labor for the Project." (Am. Compl., ECF No. 70, Count Three ¶¶ 40-44.) To prevail on this claim, Framers bore the burden to prove "formation of an agreement,

performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014). But because Framers' alleged agreement was for the provision of labor rather than the sale of goods, the questions of contract formation and breach presented by its claim are governed by the common law rather than the U.C.C. *See, e.g., Nora Beverages, Inc.*, 164 F.3d at 747 (finding that the determination of whether "a contract including both goods and services is governed by the U.C.C." depends on "whether the dominant factor or 'essence' of the transaction is the sale of the materials or the services" (internal quotation marks and citation omitted)); *Tunison v. Hollow Oak Props., LLC*, No. X08-CV-06-5001664-S, 2010 WL 4514182, at *9 (Conn. Super. Ct. Oct. 1, 2010) (holding that the U.C.C. did not apply to a contract because its "dominant factor or essence" was the provision of services rather than the sale of goods).

Under Connecticut common law, a contract forms when the parties reach "definite agreement on the essential terms of an enforceable agreement." *Willow Funding Co.,* 63 Conn. App. at 845. There must be a "meeting of the minds" between the parties, "defined as mutual agreement and assent of two parties to contract to substance and terms." *Martin v. Todd Arthurs Co., Inc.*, 225 Conn. App. 844, 851 (2024) (quoting *Kinity v. US Bancorp*, 212 Conn. App. 791, 824-25 (2022). To be enforceable, "an agreement must be definite and certain as to its terms and requirements." *Glazer*, 274 Conn. at 51 (quoting *Suffield Dev. Assocs. Ltd. P'Ship v. Soc'y for Sav.*, 243 Conn. 832, 843 (1998)).

Under the common law as well as the U.C.C., parties do not always have to agree on *all* terms before a court will regard their engagement as an enforceable contract. "[I]f the parties so intend, they may reach a binding agreement even if some of the terms of that agreement are still indefinite." *Willow Funding*, 63 Conn. App. at 844; *accord Bayer v. Showmotion, Inc.*, 292 Conn.

381, 411 (2009) ("Parties, however, may form a binding contract even if some nonessential terms of their agreement are indefinite or left to further negotiations."). "[C]ourts increasingly have been willing to flesh out the intended meaning of indefinite contract language by recourse to trade custom, standard usage and past dealings." *Willow Funding*, 63 Conn. App. at 844 (citing 1 E. Farnsworth, Contracts (2d ed. 1988), § 3.28, p. 398).

The parties must, however, agree on all *essential* terms. "[W]here 'the memorandum appears to be no more than a statement of some of the essential features of a proposed contract and not a complete statement of all the essential terms,' the plaintiff has failed to prove the existence of an agreement." *Suffield Dev. Assocs.*, 243 Conn. at 843 (quoting *Westbrook v. Times-Star Co.*, 122 Conn. 473, 481 (1937)) (brackets omitted). "Whether a term is essential turns 'on the particular circumstances of each case.'" *111 Whitney Ave., Inc. v. Comm'r of Mental Retardation*, 70 Conn. App. 692, 701 (2002) (quoting *Willow Funding Co.*, 63 Conn. App. at 845). Although "there is no bright line rule describing the essential elements of any and all enforceable contracts[,]" *id.*, "[c]learly, an essential term is one without which a party would not have entered into an agreement." *Squillante*, 208 Conn. App. at 690.

This principle is illustrated by several Connecticut Appellate Court cases. In *Hawley Avenue Associates, LLC v. Robert D. Russo, M.D. & Associates Radiology, P.C.*, for example, a lease agreement was unenforceable because the parties "never agreed on the precise location and shape of the parking area," and a witness credibly testified that he would not have signed the lease on the defendant's behalf if he had known that the parties were not in agreement about the dimensions of the parking area. 130 Conn. App. 823, 830-31 (2011). To cite another example, in *Suffield Development Associates* a construction financing agreement was unenforceable because the parties had not "agreed on a definite and certain loan amount." 243 Conn. at 843. Conversely,

41

in *Willow Funding* the court enforced a refinancing agreement because it included the essential terms, even though it omitted others.  63 Conn. App. at 845-46.

Under the common law as under the U.C.C., the question of whether the parties intended to be bound is judged by objective rather than subjective criteria.  The factfinder must determine the "existence and terms of a contract," including the essential terms, "from the intent of the parties[.]" *Auto Glass Express, Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 225 (2009) (quoting *MD Drilling & Blasting, Inc. v. MLS Construction, LLC*, 93 Conn. App. 451, 454 (2006)). This is not based on "the secret intention of a party but upon the intention manifested by his words or acts, and on these the other party has a right to proceed." *Conn. Light & Power Co. v. Proctor*, 324 Conn. 245, 267-68 (2016) (internal quotation marks omitted) (quoting *Nutmeg State Machinery Corp. v. Shuford*, 129 Conn. 659, 661 (1943)). "The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were." *Auto Glass Express*, 293 Conn. at 225 (quoting *MD Drilling & Blasting*, 93 Conn. App. at 454).

In this case, the parties' intentions—as manifested by their acts and words—lead to the conclusion that they did not intend to be bound merely upon agreeing on a price, or merely upon executing a one-page letter of intent.  More specifically, an objective view of the parties' actions and words indicates that Hudson did not intend to be irrevocably bound until the full "Trade Contract" was negotiated and executed.  With the Framers LOI, as with the Supply LOI, the number and essentiality of missing terms would make it objectively unreasonable for Framers to conclude that Hudson intended to be bound by a one-page document that agreed only on a single term.  Several crucial issues were left entirely unaddressed by the Framers LOI, including whether Framers had the financial strength to complete the project, whether it had liability insurance that

would protect Hudson from third-party claims, and whether it would agree to an indemnification provision that would provide additional protection. (*See* discussion, Section II.C.4 *supra.*) Moreover, Framers' own conduct supports the view that it did not expect the parties to be bound until full contract terms were agreed upon. Each of its pre-February 8, 2022 bids included a list of other contract terms on topics such as work scheduling, provision of utilities, safety measures, and payment schedules. (Exs. 9, 10.)

Furthermore, the parties' conduct objectively indicates an intention not to be bound until Framers successfully completed Hudson's prequalification process. Framers knew, from the 2020 letter of intent, that Hudson expected "successful completion" of that process (Ex. 3), and although Hudson did not specifically include that language in the 2022 letter of intent (Ex. 22), Framers never conducted itself as if prequalification was not required. Hudson's prequalification coordinator, Wanda Berrios, repeatedly e-mailed the Plaintiffs about prequalification documents, and the Plaintiffs either responded that they would provide them, or they failed to respond entirely. (Ex. I.) So far as the record discloses, they never once responded that prequalification was not required. (*See generally* Ex. I.) And it is undisputed that Framers never completed this required process. (Tr. 70:18-21.)

In summary, Framers had to prove the "formation of an agreement" before it could recover on Count Three. *Meyers*, 311 Conn. at 291. Under the common law, proof of the formation of an agreement requires proof that the parties' minds met on all "essential terms[,]" *Suffield Dev. Assocs.*, 243 Conn. at 84, with "essential" defined to include those terms "without which a party would not have entered into an agreement." *Squillante*, 208 Conn. App. at 690. The parties' words and actions objectively manifested an intention not to be bound unless and until Hudson's prequalification process had been completed, and unless and until agreement had been reached on

43

insurance, indemnification, and other key terms.  Because neither condition was satisfied, the Court will rule for Hudson on Count Three.

## IV.    CONCLUSION AND ORDER

For the foregoing reasons, the Court holds that the Plaintiffs failed to prove the claims in Counts One, Two, and Three of their Amended Complaint by a preponderance of the evidence. The Court respectfully directs the Clerk to enter judgment in favor of the Defendant, Hudson Meridian Construction Group, LLC, and to close the case.

So ordered this 6th day of November, 2025, at Hartford, Connecticut.

*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge